[No. C046744. Third Dist. Nov. 22, 2005.]

MICHAEL CLAUDIO, Plaintiff and Appellant, v.
REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and
Respondent.

## COUNSEL

Law Offices of Victor L. George, Victor L. George and Wayne C. Smith for Plaintiff and Appellant.

Downey Brand, Rhonda Cate Canby and David A. Dixon for Defendant and Respondent.

## OPINION

**SIMS, Acting P. J.**—Plaintiff Michael Claudio appeals from a summary judgment entered in favor of the Regents of the University of California in Claudio's suit for wrongful termination of employment.

Plaintiff was employed by the School of Veterinary Medicine at the University of California at Davis (the University) when he contracted leptospirosis, a disease that left him disabled because he could not work in any area where he might become infected. He went on medical leave and moved to Florida. An employment specialist with the University began to communicate with plaintiff about the possibility of finding him another job at the University that did not require him to work around animals. Because plaintiff had been informed on four different occasions by the University that he had been fired, he requested the University's employment specialist to communicate further directly with his attorney.[1]

---

[1] In a petition for rehearing, the University contends plaintiff was never told by the University that he had been fired. However, in his letter to the University of April 17, 1999, which was admitted for the truth of matters stated therein, and which we discuss in detail, *post*, plaintiff wrote that the University had told him on four occasions that he had been fired. For

The University's employment specialist phoned the law firm of plaintiff's attorney and, without talking to the attorney, learned the firm specialized in workers' compensation law. The specialist reasoned that because plaintiff's employment situation with the University was not a workers' compensation matter, she did not have to communicate with plaintiff's attorney. Without speaking further with plaintiff, the employment specialist checked plaintiff's resume against available positions at the University, concluded none was available that matched plaintiff's job skills, and effected plaintiff's termination from employment. This lawsuit followed.

■ California's Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.)[2] requires an employer "to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by [a disabled] employee . . . ." (§ 12940, subd. (n).) We shall conclude that, ordinarily, a disabled employee may not require an employer to communicate directly with the employee's attorney, because the interactive process contemplates that the employee and employer will communicate directly with each other to exchange information about job skills and job openings. In this case, however, unusual circumstances existed because the University had informed plaintiff on four occasions that he had been fired. In those unusual circumstances, created by the University itself, we cannot say it was unreasonable as a matter of law for plaintiff to request the University to communicate with his attorney. Moreover, the University's employment specialist did not act reasonably in unilaterally determining she did not have to communicate with plaintiff's attorney simply because the attorney worked for a firm that specialized in workers' compensation law. We therefore conclude a triable issue of fact exists with respect to whether the University violated its duty to engage in the interactive process required by the FEHA.

We shall therefore reverse the judgment based on the FEHA claim. We shall also conclude plaintiff fails to show grounds for reversal with respect to the other three counts of his complaint: (1) wrongful termination in violation of public policy; (2) retaliation for "whistleblowing"; and (3) intentional infliction of emotional distress. We shall therefore direct the trial court to enter a new order denying summary judgment/adjudication on the FEHA count, but granting summary adjudication in favor of the Regents on counts two, three, and four.[3]

---

purposes of summary judgment, we take plaintiff's evidence as true. (E.g., *Balen v. Peralta Junior College Dist.* (1974) 11 Cal.3d 821, 825 [114 Cal.Rptr. 589, 523 P.2d 629].) The University's argument fails.

[2] Undesignated statutory references are to the Government Code.

[3] The complaint also named as a separate defendant the University School of Veterinary Medicine, but the answer and summary judgment motion were filed by the Regents only, and

## STANDARD OF REVIEW FOR SUMMARY JUDGMENT

A motion for summary judgment should be granted if the submitted papers show that "there is no triable issue as to any material fact," and that the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant meets his burden of showing that a cause of action has no merit if he shows that one or more of the elements of the cause of action cannot be established, or that there is a complete defense. (Code Civ. Proc., § 437c, subd. (p)(2).) Once the defendant has met that burden, the burden shifts to the plaintiff to show that a triable issue of material fact exists. (*Ibid.*)

The burden of persuasion remains with the party moving for summary judgment. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850, 861 [107 Cal.Rptr.2d 841, 24 P.3d 493].) "When the defendant moves for summary judgment, in those circumstances in which the plaintiff would have the burden of proof by a preponderance of the evidence, the defendant must present evidence that would preclude a reasonable trier of fact from finding that it was more likely than not that the material fact was true [citation] or the defendant must establish that an element of the claim cannot be established, by presenting evidence that the plaintiff 'does not possess and cannot reasonably obtain, needed evidence.' [Citation.] We review the record and the determination of the trial court de novo. (*Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476 [110 Cal.Rptr.2d 370, 28 P.3d 116].)" (*Kahn v. East Side Union High School Dist.* (2003) 31 Cal.4th 990, 1003 [4 Cal.Rptr.3d 103, 75 P.3d 30].)

" 'First, we identify the issues raised by the pleadings, since it is these allegations to which the motion must respond; secondly, we determine whether the moving party's showing has established facts which negate the opponent's claims and justify a judgment in movant's favor; when a summary judgment motion prima facie justifies a judgment, the third and final step is to determine whether the opposition demonstrates the existence of a triable, material factual issue.' " (*Waschek v. Department of Motor Vehicles* (1997) 59 Cal.App.4th 640, 644 [69 Cal.Rptr.2d 296].)

---

judgment was entered in favor of the Regents only. In response to our request for supplemental letter briefing, the Regents assert the University School of Veterinary Medicine was an improper party (yet the Regents did not have the School of Veterinary Medicine dismissed). The Regents incorrectly claim the complaint was dismissed in its entirety. To the contrary, both the amended order granting summary judgment and the judgment itself specified judgment in favor of the Regents only. Plaintiff merely responded that he agreed the judgment was final. We take that response as a concession that the University School of Veterinary Medicine is not a legally cognizable party. We shall therefore proceed with the appeal.

On review of a summary judgment, the appellant has the burden of showing error, even if he did not bear the burden in the trial court. (*Byars v. SCME Mortgage Bankers, Inc.* (2003) 109 Cal.App.4th 1134, 1140 [135 Cal.Rptr.2d 796].) "The fact that we review de novo a grant of summary judgment does not mean that the trial court is a potted plant in that process." (*Uriarte v. United States Pipe & Foundry Co.* (1996) 51 Cal.App.4th 780, 791 [59 Cal.Rptr.2d 332].) "[D]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. In other words, review is limited to issues which have been adequately raised and briefed." (*Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116 [113 Cal.Rptr.2d 90].)

## THE COMPLAINT AND ANSWER

On August 7, 2000, plaintiff filed a complaint alleging four counts— (1) employment discrimination based on physical disability; (2) wrongful termination in violation of public policy; (3) retaliation for whistleblowing; and (4) intentional infliction of emotional distress.

The complaint alleged as follows:

Plaintiff has a physical disability—leptospirosis, a disease humans can contract from animal urine and animal blood.

In October 1994, plaintiff began working at the University School of Veterinary Medicine. He hoped to attend the veterinary school. His work record was excellent. He was terminated on August 12, 1999.

In the first count (physical disability discrimination), plaintiff alleged his leptospirosis was a motivating factor contributing to his termination on August 12, 1999, in violation of California law. Defendant allegedly acted with malice, warranting punitive damages.

The second count alleged his termination violated the public policy expressed in the FEHA.[4]

---

[4] The complaint also cited California Constitution, article I, section 8 (which states a person may not be disqualified from pursuing employment "because of sex, race, creed, color, or national or ethnic origin"). Neither side has addressed the constitutional claim in the trial court or on appeal. Ultimately, it is plaintiff's burden as appellant to show grounds for reversal. (*Byars v. SCME Mortgage Bankers, Inc., supra,* 109 Cal.App.4th at p. 1140.) Since plaintiff ignores the issue on appeal, so shall we.

The third count (retaliation) alleged his termination was in retaliation for his having reported his employer for violating the California Occupational Safety and Health Act (Cal-OSHA) (Lab. Code, § 6300 et seq.).

The fourth count alleged defendant intentionally inflicted emotional distress on plaintiff by firing him, failing to accommodate his condition, creating a pretext to terminate him, misstating the reasons for his termination, firing him for reporting defendant to Cal-OSHA, and not providing him with support or respect.

The complaint alleged plaintiff had filed claims with governmental agencies and had "followed the grievance procedure for members of the University Professional union, of which plaintiff was a member[,] to its conclusion."

The Regents filed an answer with a general denial and various affirmative defenses.

## THE SUMMARY JUDGMENT MOTION

On July 30, 2003, the Regents filed a motion for summary judgment or summary adjudication on the following grounds:

The first count (disability discrimination) failed because (1) the Regents engaged in the required interactive process to try to accommodate the disability but were rebuffed by plaintiff, (2) the Regents' accommodation efforts offered to plaintiff were adequate as a matter of law under the circumstances, and (3) plaintiff could not produce evidence to raise a triable issue that the Regents' legitimate non-discriminatory reasons for ending his leave status after two years were a mere pretext for unlawful discrimination.

The second count (wrongful termination in violation of public policy) necessarily depended on the first count and therefore must fail for the same reasons.

The Regents also argued the second count, as well as the third count (retaliation for whistleblowing) and the fourth count (intentional infliction of emotional distress), failed because plaintiff did not exhaust administrative remedies regarding grievances, i.e., administrative mandamus under Code of Civil Procedure section 1094.5.

The Regents' memorandum of points and authorities stated that for the limited purpose of this motion, the court could assume plaintiff's alleged leptospirosis existed and constituted a protected disability.

The Regents submitted a separate statement of undisputed facts, asserting among other things:

1. In the fall of 1994, plaintiff (a University undergraduate student) took a part-time job at the University Veterinary Medical Teaching Hospital (the Clinic).

2. In late March 1996, plaintiff contracted leptospirosis, a zoonotic disease (i.e., a disease that can spread from animals to humans) with flu-like symptoms.

3. In May 1996, plaintiff applied for and was hired to work half-time in the small animal anesthesia service of the Clinic.[5]

4. In 1996, plaintiff's application for admission to the veterinary school was denied, because he did not meet the minimum academic requirement.

5. In 1997, plaintiff assertedly made an anonymous report to Cal-OSHA about health and safety violations at the Clinic.

6. Plaintiff stopped working on July 3, 1997, and moved to Florida.[6]

Clinic director William Herthel declared as follows: Plaintiff abruptly stopped working on or about July 3, 1997, and said he would be taking an indefinite amount of time off. "Eventually," Herthel received a doctor's written statement that plaintiff was unable to work because of his fear of infection from animals. Doctors provided a series of excuses for plaintiff's absence over the next several months. They always stated plaintiff would be able to return to work in a few weeks, but he never did. Several times, the excuse period ended with no word from plaintiff or his doctors until Herthel inquired, at

---

[5] Plaintiff argues the Regents made him obtain a California license even though the job called for a California license or its equivalent, and he had equivalent licenses from other states. The point is not material to our disposition.

[6] Plaintiff purported to dispute and object to the assertion that he stopped working in July 1997, but his only basis for doing so was that he "was taken off work by Dr. Linne, his treating physician."

Plaintiff suggests he would have returned to California for a job. The Regents' separate statement of undisputed facts also said plaintiff failed to tell them he was injured in an automobile accident in Florida. Plaintiff said in deposition that he went to Florida to obtain an objective medical evaluation of leptospirosis, because the disease is a tropical disease, and Florida is a tropical climate. On appeal, plaintiff says he would not have been in the accident had he been given an appropriate job at the Clinic. For purposes of this appeal, we disregard the Florida accident. We also disregard the Regents' citation of deposition testimony of plaintiff's treating doctors in Florida.

which point plaintiff said he needed to have the leave extended a little longer. Altogether, plaintiff was on medical leave status for a full two years—much longer than the six months ordinarily permitted by University policy—during which plaintiff's job was held open for him.

The Regents submitted evidence of the opinions of the doctors who examined and/or treated plaintiff, including the following:

Dr. Jess Groesbeck, a psychiatrist, testified in deposition that he was the "agreed medical examiner" for plaintiff's workers' compensation case. Dr. Groesbeck evaluated plaintiff on October 20, 1998, and wrote his report on December 30, 1998, stating in part that it was doubtful plaintiff could return to work at the Clinic because he was very phobic about working with animals. In February 1999, Dr. Groesbeck said that jobs in which infection was a possibility should be avoided, and plaintiff should not work around any environment with the possibility of contracting any infection.[7] In May 1999, Dr. Groesbeck reported plaintiff was not able to perform the essential functions of his job.

Dr. Stuart Linne, an infectious disease consultant who first saw plaintiff in April 1996 as a workers' compensation appointment, said plaintiff complained of symptoms such as headache and nausea, but they did not significantly improve with the prescribed antibiotics. Dr. Linne ultimately concluded the reason plaintiff was unable to work was that he had developed a phobia about dogs.

7. In early 1999, before "medically separating" plaintiff from his employment, Herthel spoke with Kathleen McLean at the university's vocational rehabilitation office. She said plaintiff's psychologist reported his status was permanent and stationary with respect to his phobic reaction to work, and he would never be able to work in a veterinary setting where he thought he might be exposed to infection. Herthel told McLean that all veterinary technician jobs at the Clinic involved some level of exposure to infected animals because the Clinic existed only to treat Northern California's most severely ill and injured animals, and all technician jobs involved contact with

---

[7] In February 1999, Dr. Groesbeck opined plaintiff "continues temporarily totally disabled, but he is ready to begin efforts at rehabilitation. The restriction would be that he should not work around any environment with the possibility of contracting any infection. Hopefully a job in which he could utilize his veterinary skills but without the danger of infection would be an ideal job for him. There may be other alternatives, but he has a lot of training in the veterinary field and hopefully this can be utilized in finding him a job. However, jobs in which infection is a possibility should be avoided."

the animals. Herthel declared: "I was aware that [plaintiff] aspired to be a veterinarian and had worked as a veterinary technician in other states for many years before he started at [the Clinic]. I had no reason to suspect he had skills or interests applicable to any of the small handful of jobs at [the Clinic] that did not involve working directly with animals, so it appeared to me that there was no way for [plaintiff] to return to a job at [the Clinic] that could be made consistent with his doctor's restriction. It was my understanding from Ms. McLean that [plaintiff] refused to talk to her about whether he had any non-animal-treatment skills or interests, so I had to assume he did not. I concluded that [plaintiff] was unable to perform the essential functions of any job at [the Clinic] because every job for which I knew he had skills and interest involved at least some risk of exposure to infection." Herthel said he was informed and believed that McLean looked for other positions in the university but found none that matched plaintiff's knowledge, skills and training. Accordingly, Herthel sent a letter to plaintiff on June 25, 1999, informing him of the intent to "medically separate" him. Plaintiff requested a hearing, which was conducted. University manager Gary Schultz determined all university procedures had been properly followed. Herthel issued a letter medically separating plaintiff from his employment as of August 12, 1999.

8. University vocational rehabilitation counselor Kathleen McLean attested in a declaration that she "attempted to engage [plaintiff] in an interactive process to determine if reasonable accommodation was possible, or to find alternate work for him. I spoke with [plaintiff] in January and again in March 1999, and I exchanged correspondence with him. During those exchanges, I attempted to get [plaintiff] to participate in the vocational rehabilitation process, but he refused."

McLean sent a letter to plaintiff on March 11, 1999, stating, "I understand from our conversation that you do not wish to participate in the medical separation process." In case he changed his mind, she included forms for his (Florida) doctors and authorization for release of medical information. (McLean followed up with a letter dated March 22, 1999, that she would use Dr. Groesbeck's evaluation.)

On April 17, 1999, plaintiff wrote the following letter to McLean:

"Dear Ms. McLean:

"This note is detailed follow up to your correspondence dated March 11 and March 22, 1999.

"During our first telephone conversation, I discussed fact [*sic*] that I am currently unable to participate in vocational rehabilitation because I am still undergoing evaluation/treatment for my occupational injuries, but would be interested in future participation. Reasons for evaluation/treatment delays were also discussed.

"I then answered numerous questions you brought up regarding my injuries, physical abilities and current health status because you claimed ARM[8] had not furnished you with any such medical information or doctor's reports.

"I also took the opportunity to ask you about what medical and dental benefits, if any, were available to me during the interim period (e.g., current date to date of vocational rehabilitation participation acceptance); reason being on or about November 1998, UCD Employee Benefits Office clearly explained to me that:

"1. *I had no medical and, or dental benefits . . .*

"2. *I was ineligible for any benefits because I had been **actively separated (fired) from UCD employment, 8/1/98, by my home department, UCD VMTH** . . .*

"As explained, this information was first divulged to me when I telephoned UCD Employee Benefits Office to inquire about utilizing said benefits. This news was confirmed a second time via telephone inquiry, again a third time via US mail and yet a fourth time upon my attorney's inquiry. You responded that you would research these matters and get back to me.

"During our second telephone conversation several weeks later, I explained that I had recently received notification of retroactive to current UCD employee health benefits; this notification arriving suddenly in the weeks following our first discussion.

"You explained that I had not been separated but that the university now required my taped verbal authorization to medically separate me from UCD employment. My response was this was redundant as I had indeed been separated from UCD employment on 8/1/98. You again insisted that I had not been separated from UCD employment, and further discussed prompt medical separation authorization options. In light of these conflicting circumstances, I

---

[8] Apparently a workers' compensation insurance carrier.

refused said taped verbal authorization, preferring to first consult my legal counsel. You then explained you would be sending authorization release by mail for me to immediately sign and return, instead of to my attorney as I subsequently requested; reason given me was you felt UCD's current demand for my authorization and active participation in the medical separation process need not involve my attorney and would be more expedient without attorney involvement.

"Ms. McLean, I am amenable to cooperating with you in whatever way reasonably possible, however, given the obvious complexity of these matters, it is necessary to have all reviewed by Mr. Johnsen before any considerations are promised. Accordingly, I again request that you address your referenced correspondence, the university's interest in now medically separating me from UCD employment and, or issues concerning vocational rehabilitation, with my attorney:

"**Mr. Craig Johnson, Esq. [¶] Mastagni, Holstedt and Chiurazzi [¶] 1912 I Street, Suite 102 [¶] Sacramento, CA 95814 [¶] (916) 446-4692**

"An aside, perhaps Mr. Johnsen could also be of assistance to you in obtaining the medical record information which you have described ARM as not yet having provided you with.

"Thank you for your cooperation and prompt attention to these matters.

"Michael A. Claudio, RVT"

McLean attested plaintiff wanted her to go through his attorney, but she contacted plaintiff's attorney's office only to verify that the attorney was representing plaintiff only on the workers' compensation case.[9] This was an employment matter, not a workers' compensation matter. She reviewed plaintiff's resume and job application he submitted when originally hired, but they focused on animal care skills. Plaintiff was invited to but refused to identify any non-animal-care job knowledge, skills, and abilities. McLean then looked for non-animal-care jobs at the University campus for which plaintiff may have qualified according to his resume, but there were no openings. His resume showed a long history of animal care positions and some brief experience in marketing, production, client relations, and accounting while self-employed. She looked for 30 days but was unable to locate any open positions anywhere on the University campus that met plaintiff's skills and medical restrictions.

---

[9] As we shall point out below, in her deposition, McLean revealed that she had not talked to plaintiff's attorney, nor did she speak to anyone about plaintiff's case. Rather, she spoke with an employee of the firm, who said the firm did workers' compensation law.

McLean prepared a "Medical Separation Review" memo on June 14, 1999, stating she spoke with plaintiff twice (in January and March 1999) and corresponded with him twice. She told him she was seeking his participation in her review of the medical separation. Plaintiff informed her in April 1999 that he was unable to participate because he was still undergoing evaluation/treatment for his occupational injuries. He declined to authorize her to speak with his treating physician in Florida. She sent him a packet for his doctor to fill out in the event plaintiff reconsidered. Dr. Groesbeck opined plaintiff should not work in any environment with the possibility of contracting an infection, but he could perform his job "if" he did not have to handle animals directly or have the danger of getting puncture wounds. Since plaintiff indicated he would not participate in the process, McLean requested his job application and resume to elicit skills when searching for an alternate position. His job history consisted of veterinary jobs. His application reflected self-employment for a brief period while working as a veterinary technician/business manager, providing marketing, production, client relations, and accounting. She checked with Herthel, who said all animal health technician positions require contact with animals and needles. The Clinic has some positions that do not involve these restrictions, but none had opened for which he may qualify since the search for alternate positions began (May 11, 1999).

9. The Regents asserted the only accommodation plaintiff requested was a leave of absence, and he was granted that accommodation for two years.

10. Regarding the failure to exhaust internal grievance procedures, the Regents' separate statement of undisputed facts asserted (1) plaintiff was a member of the University Professional and Technical Employees Union (UPTE); (2) the UPTE union contract had an extensive grievance mechanism that plaintiff employed; (3) he filed and lost a number of grievances against the Regents, though he never filed a whistleblower claim under section 8547.10; and (4) he never "appealed" grievance denials by pursuing administrative mandamus under Code of Civil Procedure section 1094.5.

The Regents' separate statement of undisputed facts also asserted other facts, e.g., that plaintiff's separation was confirmed in a *Skelly* hearing (*Skelly v. State Personnel Bd.* (1975) 15 Cal.3d 194 [124 Cal.Rptr. 14, 539 P.2d 774] (*Skelly*)), that plaintiff had reemployment rights for one year after separation, that in 2000 plaintiff expressed interest in a job that was never created, that plaintiff was disabled in 2000 from a 1999 car accident in Florida, that plaintiff lied on the resume he submitted to get the job at the Clinic. Plaintiff disputes these assertions. For purposes of this appeal, we need not address these points, which are not within the scope of issues made material by the complaint. (*FPI Development, Inc. v. Nakashima* (1991) 231

Cal.App.3d 367, 381 [282 Cal.Rptr. 508] [pleadings delimit the scope of issues in summary judgment proceedings].)

## THE OPPOSITION

Plaintiff filed an opposition to the summary judgment motion, as follows:

In response to the Regents' separate statement of undisputed facts, plaintiff made numerous points, including the following:

1. He complained to Cal-OSHA in April 1997. Cal-OSHA inspected the Clinic in June 1997. Herthel knew plaintiff made the report and told plaintiff this would "cause a lot of problems" for plaintiff.

2. In response to the point about denial of plaintiff's application for admission to the veterinary school, plaintiff made the puzzling assertion that he "had been assured that if not admitted, he would be interviewed by the admissions committee In [sic] fact, Linda Savely, the ICU Director that Plaintiff [sic] would be admitted to veterinary school."

3. In response to the medical opinions cited by the Regents, plaintiff claimed the only doctor relied upon by the Regents was Dr. Groesbeck, and Dr. Groesbeck believed plaintiff could have returned to work with accommodation, the only restrictions relating to administering anesthesia, intravenous and needle puncture activities, and contact with zoolotic diseases. Plaintiff cited page 8 of Dr. Groesbeck's deposition, which said, "Well, I felt that he couldn't return to the essential functions of his job in these specific areas, anesthesia, manually doing anesthesia, intravenous and needle puncture activities with animals. And second, being in touch with zoolotic diseases, z-o-o-l-o-t-i-c. His fears of exposure were too strong." When asked about accommodation, the doctor said, "I felt if he could have accommodation and not handle animals directly or doing the puncture wounds, then he could perform other aspects of his job." Plaintiff also cited Dr. Groesbeck's February 1999 supplemental report, which stated, "a job in which [plaintiff] could utilize his veterinary skills but without the danger of infection would be an ideal job for him."

4. In response to the Regents' assertion that they allowed him an extended leave of absence, plaintiff responded he encountered delays in receiving medical treatment between September 1997 and January 1998, because the workers' compensation carrier delayed approval of medical treatment in Florida, and the University inadvertently dropped ("I-4'd") plaintiff from the system.

5. In response to the Regents' assertion that McLean tried to determine reasonable accommodation or alternative placement, plaintiff gave a rambling response that included the following:

a. McLean refused to go through plaintiff's attorney, which plaintiff claims was against University policy. As supposed evidence, plaintiff cited McLean's deposition, in which she explained plaintiff wanted her to deal with his workers' compensation lawyer, but this was not a workers' compensation matter, it was an employment matter. She told plaintiff she needed to work directly with him. Concerning University policy, plaintiff cited from the deposition of Barbara Vanderpool, manager of the personnel payroll office at the Clinic:

"Q. What is your procedure regarding speaking with an employee who's on workers' comp [sic] represented by an attorney?

"[Defense counsel]: Objection. Vague and ambiguous. Incomplete hypothetical. Lack of foundation.

"If you have a procedure, you can tell what it is.

"THE WITNESS: Generally, when they have representation, we are not to talk to them."

b. McLean relied only on Dr. Groesbeck and never reviewed any medical records of doctors who treated plaintiff.

c. McLean did not investigate whether reasonable accommodation could be achieved by modifying his job requirements. Beyond a brief discussion with Herthel, she failed to research alternate positions with the Clinic because she claimed she did not have any current information about his job skills. She was never given his personnel file. She admitted she only reviewed the job description for the anesthesia position. In the supporting evidence cited by plaintiff, McLean testified in deposition, "I had no skills, no information about him other than this agreed medical saying that he had certain restrictions. Normally, the employee would have provided me with some information so that the two of us could work together with the department to see if there was anything else. I had nothing." She therefore obtained his original job application and resume from the Clinic, and that is what she used.

Plaintiff asserted McLean "was relying on" plaintiff himself to check for job openings. In the cited deposition testimony, McLean said she reviewed job listings for plaintiff and her other cases, and she told her clients who had computers that they should also check the job listings.

Plaintiff asserted that when other technicians were injured, they were given modified duty (paperwork), and Herthel admitted clerical jobs were available. The cited deposition testimony of Herthel showed as follows:

"Q. W[ere] there any clerical jobs that he could have done that he did not have to work with animals?

"A. Yeah. But we didn't even know if he could type or what his skills were. We have no record of what—he wasn't talking to Kathy [McLean]. The hospital has typists, medical transcriptions. They have people that answer the phone. They're all exposed to animals. There's no place in the hospital that does not have animal contact."

6. In response to the Regents' assertion that plaintiff refused to participate with McLean, telling her only that she should call his workers' compensation lawyer, plaintiff responded (as part of a rambling response): "Plaintiff told Ms. McLean that he was currently unable to participate in vocational rehabilitation for the reasons that they had discussed. However, he expressed his desire to participate in the future." Plaintiff cited his April 17, 1999, letter, which we have already described.

7. In response to the Regents' assertion that plaintiff declined to cooperate in getting current medical records from his Florida physician or in identifying other non-animal-related job skills, plaintiff responded that he expressly stated his willingness to cooperate, but he merely requested that McLean go through his lawyer (as supposedly required by University policy) because the defendant's computer had mistakenly "I-4'd" him on "numerous occasions," preventing him from obtaining medical treatment. Other cited evidence (McLean's deposition) showed her stating plaintiff said he was amenable to cooperating but only through his attorney. She did not contact plaintiff's attorney (other than to confirm that he was plaintiff's attorney only on the workers' compensation case), because this was an employment issue, not a workers' compensation issue.

8. In response to the Regents' assertion that they medically separated plaintiff in August 1999 after determining his job could not be modified and no other jobs were available, plaintiff responded the decision to separate plaintiff was made as early as March 2, 1999, when the University and Cal-OSHA submitted a motion to withdraw citation and appeal, effectively concluding the Cal-OSHA proceeding initiated by plaintiff. Plaintiff cited as supporting evidence the motion filed with the Cal-OSHA to withdraw the citation and appeal, and exhibit U, which is blank in our clerk's transcript, but which plaintiff asserts is Personnel Policies for Staff Members, dated March 2, 1999. It is unlikely that personnel policies would contain evidence

of the Regents' decision to terminate plaintiff, and the Cal-OSHA motion certainly contains no such evidence.

Plaintiff additionally filed his own statement of undisputed facts, which we will address in our discussion, below, where appropriate. Although the Regents made evidentiary objections to plaintiff's filing, the Regents failed to obtain court rulings on the objections, and therefore we deem the objections waived or impliedly overruled. (*Sharon P. v. Arman, Ltd.* (1999) 21 Cal.4th 1181, 1186, fn. 1 [91 Cal.Rptr.2d 35, 989 P.2d 121], disapproved on another point in *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 853, fn. 19 [107 Cal.Rptr.2d 841, 24 P.3d 493].) Many of plaintiff's assertions relate to alleged retaliation for the Cal-OSHA complaint, which we need not address because we conclude, below, the retaliation count fails on procedural grounds.

## THE REPLY

The Regents filed a reply.

## THE RULING

The trial court granted summary judgment. In its amended order filed March 2, 2004, the court granted the Regents' request for judicial notice of letters denying 17 grievances filed by plaintiff. As to the first count (physical disability discrimination), the court said it was undisputed that plaintiff stopped working on July 3, 1997, and was unable to work at all from July 1997 through December 2000. The Regents kept plaintiff on leave-of-absence status for over two years, holding his job open for him much longer than required by the Regents' leave policy. Reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected.

The court also said that, as to the other counts, it was undisputed that plaintiff did not seek review of any of the denials of his administrative grievances, and accordingly the administrative decisions are final. Plaintiff has appealed.[10]

---

[10] Plaintiff filed a notice of appeal from the nonappealable amended order granting summary judgment. We denied a motion to dismiss the appeal brought by the Regents but indicated we would dismiss the appeal unless an appealable judgment was entered. The judgment was entered, and we will treat the premature notice of appeal as an appeal from the judgment. (Cal. Rules of Court, rule 2(e).)

## DISCUSSION

### I.  *Count One*

Plaintiff argues triable issues exist concerning the FEHA. We agree with his argument that "issues of fact exist whether respondent engaged in the interactive process in good faith." (Capitalization omitted.)

Although the FEHA is also implicated in count two (termination in violation of public policy based on FEHA), the trial court granted summary adjudication of count two on the additional ground of failure to exhaust administrative remedies and, as we discuss below, plaintiff fails to show any basis for reversal with respect to the additional ground.

For purposes of the summary judgment motion, the Regents accepted that plaintiff has leptospirosis and that it constitutes a protected disability under the FEHA.

### A.  *Legal Framework*

■ Section 12940 makes it an unlawful employment practice to discharge a person from employment or discriminate against the person in the terms, conditions or privileges of employment, because of physical or mental disability. (§ 12940, subd. (a).) The FEHA "does not prohibit an employer from . . . discharging an employee with a physical or mental disability, . . . where the employee, because of his or her physical or mental disability, is unable to perform his or her essential duties even with reasonable accommodations . . . ." (§ 12940, subd. (a)(1).) The term "reasonable accommodation" includes "[j]ob restructuring, . . . reassignment to a vacant position, . . . and other similar accommodations for individuals with disabilities." (§ 12926, subd. (n)(2).)

Section 12940 provides: "It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: [¶] . . . [¶] (m) For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee [unless accommodation would produce undue hardship to the employer's operation]. [¶] (n) *For an employer or other entity covered by this part to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition.*" (Italics added.)

■ Section 12965 authorizes the filing of a civil action based upon "an unlawful practice." In *Bagatti v. Department of Rehabilitation* (2002) 97 Cal.App.4th 344 [118 Cal.Rptr.2d 443], this court held that nothing in section 12965 limits such an unlawful practice to the unlawful practice of disability discrimination found in section 12940, subdivision (a). (*Id.* at p. 357.) We said that since subdivision (m) of section 12940, outlawing the failure to provide reasonable accommodation, was statutorily defined as a separate employment practice, section 12965 authorized the filing of a civil action based on that unlawful practice. (*Ibid.*)

The same reasoning applies to subdivision (n) of section 12940, the failure to engage in the interactive process. An employee may file a civil action based on the employer's failure to engage in the interactive process.

The complaint did not allege FEHA liability based on the employer's failure to engage in the interactive process or failure to accommodate a disability, but merely alleged the Regents terminated plaintiff's employment due to his disability. As indicated, count one alleged plaintiff had a physical disability that was a motivating factor contributing to his termination. Plaintiff alleged he filed his complaint with the Equal Employment Opportunity Commission and the FEHA and received a "right to sue" letter.

However, although the complaint did not allege liability based on the employer's failure to engage in the interactive process, the Regents' motion was based on plaintiff's inability to prove a failure to accommodate, and plaintiff responded in kind. Each side contended the other failed to engage in the interactive process. Both sides argue the merits of the interactive process claim on appeal, and the Regents do not contend plaintiff's claim lies outside the allegations of his complaint. In these circumstances, we will address the claim on the merits. (See *FPI Development, Inc. v. Nakashima, supra*, 231 Cal.App.3d at pp. 382–383.)

■ *Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245 [102 Cal.Rptr.2d 55] (*Jensen*) said, "the employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." (*Id.* at p. 263.)

"Holding a job open for a disabled employee who needs time to recuperate or heal is in itself a form of reasonable accommodation and may be all that is required where it appears likely that the employee will be able to return to an existing position at some time in the foreseeable future. [Citation.]" (*Jensen, supra*, 85 Cal.App.4th at p. 263.)

"It is an employee's responsibility to understand his or her own physical or mental condition well enough to present the employer at the earliest opportunity with a concise list of restrictions which must be met to accommodate the employee." (*Jensen, supra*, 85 Cal.App.4th at p. 266.)

"[I]t is the responsibility of both sides to keep communications open and neither side has a right to obstruct the process." (*Jensen, supra*, 85 Cal.App.4th at p. 266.)

### B. *Evidentiary Issue*

An important piece of evidence in this case was plaintiff's April 17, 1999, letter to vocational rehabilitation counselor Kathleen McLean, which both sides used for the truth of its content.

Plaintiff's opposition papers included a copy of this letter, but without proper authentication. Plaintiff's declaration did not mention the letter. Plaintiff's attorney merely submitted his own declaration that the attached copy was "a true and correct copy of Letter of April 17, 1999." This is not proper authentication. (Evid. Code, § 1400 et seq.) Nevertheless, there was no objection by the Regents, who had themselves submitted a copy of the letter with their moving papers for the truth of the matters stated in the letter—with no objection by plaintiff. Any objection not raised in the trial court is forfeited (Code Civ. Proc., § 437c, subd. (b)(5)), and we shall consider the letter for the truth of the matters stated in it.

### C. *Summary Adjudication of Count One Was Improper*

Plaintiff's brief contains a heading claiming the trial court applied the incorrect burden-shifting analysis to the failure-to-accommodate claim. Plaintiff then discusses the legal standard but fails to explain how the trial court misapplied the law.

We note that, in their respondents' brief on appeal, the Regents argue section 12940, subdivision (a)(1) (which allows discharge of an employee who is unable to perform his essential duties even with accommodation), in and of itself justifies summary adjudication of the FEHA claims, because

plaintiff was unable to perform his essential duties with or without accommo- dation. Plaintiff's reply brief protests this new theory being presented for the first time on appeal. We note the issue was raised in passing in the Regents' points and authorities in the trial court. We nevertheless reject the Regents' argument, because it does not resolve the case. It overlooks that "reasonable accommodation" includes "[j]ob restructuring, . . . reassignment to a vacant position, . . . and other similar accommodations for individuals with disabili- ties." (§ 12926, subd. (n)(2).)

The Regents' motion asserted there was no actionable failure to accommo- date a disability, because (1) plaintiff failed to participate in the interactive process, and (2) the Regents had no alternate job available for plaintiff. Because we shall conclude a triable issue exists as to whether the University failed to participate in the interactive process, it cannot be known whether an alternate job would have been found.

### 1. *Facts*

In early 1999, an agreed medical examiner concluded, and plaintiff did not dispute, that his disability precluded his return to his old job or to any other job that might expose him to infection from animals. That restriction elimi- nated any jobs at the Clinic.

As indicated, the University vocational rehabilitation counselor Kathleen McLean attested in a declaration that she "attempted to engage [plaintiff] in an interactive process to determine if reasonable accommodation was pos- sible, or to find alternate work for him. I spoke with [plaintiff] in January and again in March 1999, and I exchanged correspondence with him. During those exchanges, I attempted to get [plaintiff] to participate in the vocational rehabilitation process, but he refused."

McLean sent a letter to plaintiff on March 11, 1999, stating, "I understand from our conversation that you do not wish to participate in the medical separation process." In case he changed his mind, she included forms for his (Florida) doctors and authorization for release of medical information. (McLean followed up with a letter dated March 22, 1999, that she would use Dr. Groesbeck's evaluation.)

Plaintiff refused to provide information about what other jobs he might be willing or able to do. Instead, plaintiff referred McLean to his attorney, as reflected in plaintiff's letter to McLean dated April 17, 1999, which we have set out verbatim, above. In the letter, plaintiff explained that he had been told on four occasions that he had been fired by the University. Plaintiff requested that McLean communicate with his attorney "given the obvious complexity of these matters."

In her declaration, McLean attested, "Because he refused to cooperate, I had no direct information about Claudio's knowledge, skills and abilities. I verified with Mr. Johnson's [sic] office that Mr. Johnson [sic] represented Claudio only on workers' compensation matters, not on any other employment matters."

In deposition, McLean testified:

"A. I called the office, spoke with Ken Aroldy, who was the rehab coordinator with Mastagni's office, and I asked general questions about whether or not this could—was a worker comp [sic] attorney that he had, because he had said he would only talk to me through an attorney.

"I don't remember if it was that first conversation or not. That is not the practice. This was an employment issue.

"I needed to work directly with him, and so I told him, 'I need to work directly with you.' "

McLean also testified: "I don't recall that [plaintiff] asked me to call the attorney at all. He said he wouldn't work with me, it had to go through his attorney. I didn't work with the attorney. I called the office to determine whether or not it was truly worker comp [sic] or whether it was an employment attorney. I was convinced it was a worker comp [sic] attorney, and this was an employment action, so I was asking him to work with me directly." McLean said she did not ask the person at the attorney's office whether she could contact plaintiff directly.

Unable to get information directly from plaintiff and having decided not to contact plaintiff's attorney, McLean reviewed plaintiff's resume and job application he submitted when originally hired, but they focused on animal care skills. Plaintiff was invited to but refused to identify any non-animal-care job knowledge, skills, and abilities. McLean then looked for non-animal-care jobs at the University campus for which plaintiff may have qualified according to his resume, but there were no openings. His resume showed a long history of animal care positions and some brief experience in marketing, production, client relations and accounting while self-employed. She looked for 30 days but was unable to locate any open positions anywhere on the University campus that met plaintiff's skills and medical restrictions.

McLean prepared a "Medical Separation Review" memo on June 14, 1999, setting forth the pertinent events, as follows: She spoke with plaintiff twice (in January and March 1999) and corresponded with him twice. She told him she was seeking his participation in her review of the medical separation.

Plaintiff informed her in April 1999 that he was unable to participate because he was still undergoing evaluation/treatment for his occupational injuries. He declined to authorize her to speak with his treating physician in Florida. She sent him a packet for his doctor to fill out in the event plaintiff reconsidered. Dr. Groesbeck opined plaintiff should not work in any environment with the possibility of contracting an infection, but he could perform his job "if" he did not have to handle animals directly or have the danger of getting puncture wounds. Since plaintiff indicated he would not participate in the process, McLean requested his job application and resume to elicit skills when searching for an alternate position. His job history consisted of veterinary jobs. His application reflected self-employment for a brief period while working as a veterinary technician/business manager, providing marketing, production, client relations, and accounting. She checked with Herthel, who said all animal health technician positions require contact with animals and needles. The Clinic has some positions that do not involve these restrictions, but none was open for which he may qualify since the search for alternate positions began (May 11, 1999).

### 2. *Analysis*

The issue is whether a triable issue exists as to whether it was reasonable for McLean to refuse to communicate with plaintiff's attorney.

■ Ordinarily, an employee has no right to withdraw himself from the process and force the employer to engage in the interactive process through the employee's attorney. The kind of information designed to be elicited by the interactive process (job skills and interests, etc.) is personal to the individual employee. Requiring the employer to use the employee's attorney as a conduit for this personal information would slow the process unnecessarily.[11]

■ Although we conclude that *ordinarily* the employee cannot force the employer to go through the employee's attorney for the interactive process,

---

[11] Plaintiff claims McLean breached a University policy to go through counsel. However, the only evidence is deposition testimony of a personnel payroll manager, as follows:

"Q. What is your procedure regarding speaking with an employee who's on workers' comp [*sic*] represented by an attorney?

"[Defense counsel]: Objection. Vague and ambiguous. Incomplete hypothetical. Lack of foundation.

"If you have a procedure, you can tell what it is.

"THE WITNESS: Generally, when they have representation, we are not to talk to them."

Plaintiff cites no evidence linking payroll procedure to reasonable-accommodations procedure. To the contrary, McLean's deposition suggests it was "not the practice" to involve workers' compensation lawyers in employment matters.

We conclude plaintiff fails to show University policy required McLean to go through his attorney.

here there were unusual circumstances. The University had told plaintiff four times (according to plaintiff's April 1999 letter) that his employment had been terminated. The fact that he had been terminated ("I-4'd" or dropped from the computer) made his legal status uncertain. We cannot say as a matter of law that it was unreasonable for plaintiff to require the University to communicate with his attorney. "Why do clients go to lawyers? . . . Lawyers have special skills and knowledge not generally shared by people and which it would be uneconomic for most people who are not themselves lawyers to attempt to acquire. People go to lawyers when they want to know what the law provides and generally, when they desire to assert legal rights and avoid legal liability. . . ." (Wolfram, Modern Legal Ethics (1986 ed.) § 4.1, pp. 145–146.) A jury should decide the question whether the University failed to engage in the interactive process in good faith when it refused to communicate with plaintiff's attorney.

Moreover, it was unreasonable for McLean to make a unilateral decision that plaintiff's workers' compensation attorney would not involve himself in this employment matter. She never talked to plaintiff's attorney. She should have asked him whether he would represent plaintiff in this employment matter.

A triable issue of fact exists with respect to whether the University wrongfully failed to engage in the interactive process required by FEHA.

The Regents also submitted evidence that no alternate positions were available at the University campus for the apparent job skills reflected in plaintiff's original job application and resume. However, since we conclude a triable issue exists concerning failure by the University to participate in the interactive process, the judgment cannot be affirmed on the ground that no alternate jobs were available.

The Regents argue they are entitled to summary judgment on the alternative ground that the accommodations provided to plaintiff were adequate as a matter of law. The asserted accommodations were multiple extensions of leave of absence, which ended up giving plaintiff four times the usual amount of leave. The Regents note the trial court said reasonable accommodation does not require the employer to wait indefinitely for an employee to be able to return. We also note plaintiff's formal written request for accommodation came *after* the employer's notice of intent of medical separation.

However, the Regents, through McLean, offered the interactive process to plaintiff, and the basis for the Regents' summary judgment motion (as stated in their memorandum filed in the trial court) was that they offered the

"required interactive process but were rebuffed by Claudio, who refused to participate . . . ." It is thus too late for the Regents to argue there was no need for an interactive process.

The Regents assert plaintiff was totally disabled and therefore the only accommodation that could have been at issue, if plaintiff had participated in the interactive process, was an unlimited extension of his leave of absence. However, as is apparent from our recitation of the record, it is not at all clear that this is true. At a minimum, it appears plaintiff may have been physically able to handle clerical positions. Thus, this is not a case (at least not yet) where it can be said an interactive process would have been futile. (Cf. *Swonke v. Sprint, Inc.* (2004) 327 F.Supp.2d 1128, 1137 [interactive process would have been futile because plaintiff was totally disabled from any employment].)

We conclude summary judgment must be reversed because a triable issue exists as to whether the Regents could be liable based on the employer's failure to engage in good faith in the interactive process. (See *Jensen v. Wells Fargo Bank, supra,* 85 Cal.App.4th at p. 263.)

We need not address plaintiff's other arguments regarding count one.

### II. Counts Two Through Four—Internal Grievance Procedures

Plaintiff contends triable issues exist regarding failure to exhaust grievance procedures with respect to count two (termination in violation of public policy), count three (retaliation for whistleblowing), and count four (infliction of emotional distress). We disagree.

The Regents argued they constitute a constitutionally created agency (Cal. Const., art. IX, § 9) with quasi-adjudicative powers over personnel matters. (*Edgren v. Regents of University of California* (1984) 158 Cal.App.3d 515, 521, fn. 1 [205 Cal.Rptr. 6].) Plaintiff pursued many grievances through his union's collective bargaining agreement, but plaintiff did not seek administrative mandamus (Code Civ. Proc., § 1094.5) from the unfavorable decisions. Those decisions are therefore final and binding. (*Johnson v. City of Loma Linda* (2000) 24 Cal.4th 61, 69–70 [99 Cal.Rptr.2d 316, 5 P.3d 874].)

The Regents' separate statement of undisputed facts asserted:

Plaintiff, a member of UPTE, filed and lost a number of grievance proceedings against the Regents, but appealed none of them to a superior court.

■ Plaintiff never filed a claim consistent with section 8547.10[12] (which requires such a claim before pursuing court action) or with the Regents' whistleblower policy.

The applicable UPTE union contract had an extensive grievance mechanism, which plaintiff employed.

The Regents have no record that plaintiff ever appealed a grievance denial to its final conclusion, a writ proceeding under Code of Civil Procedure section 1094.5.

As supporting evidence for these factual assertions, the Regents cited the declaration of its labor relations specialist, Robert Martinez, and letters rejecting 17 union grievances, for which the Regents requested judicial notice.

The declaration of Robert Martinez, the Regents' labor relations specialist, said:

"2. In 1995, [plaintiff] was hired as a part-time Animal Health Technician at [the Clinic] associated with [the University]. According to the regularly-maintained records of the university, he worked at [the Clinic] for a little less than two years before taking an extended leave of absence. He was medically separated in August 1999. His separation was consistent with the policy adopted by his union and with the general university policy on medical separation [which was attached] . . . .

---

[12] Section 8547.10, as amended in 1999 (Stats. 1999, ch. 673, § 7), provides in part: "(a) A University of California employee, including an officer or faculty member, or applicant for employment may file a written complaint with his or her supervisor or manager, or with any other university officer designated for that purpose by the regents, alleging actual or attempted acts of reprisal, retaliation, threats, coercion, or similar improper acts for having made a protected disclosure [before a 1999 amendment, the wording was: 'having disclosed improper governmental activities' (Stats. 1993, ch. 12, § 8, p. 3410)], together with a sworn statement that the contents of the written complaint are true, or are believed by the affiant to be true, under penalty of perjury. The complaint shall be filed within 12 months of the most recent act of reprisal complained about. [¶] . . . [¶] (c) [Defendant may be liable for damages, punitive damages, and attorney's fees.] *However, any action for damages shall not be available to the injured party unless the injured party has first filed a complaint with the university officer* identified pursuant to subdivision (a), and the university has failed to reach a decision regarding that complaint within the time limits established for that purpose by the regents. [¶] . . . [¶] (f) [added in 1999] Nothing in this article shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or state law or under any employment contract or collective bargaining agreement." (Italics added.)

"3. One of my routine responsibilities for the university is overseeing and keeping track of grievance proceedings. I have records of numerous grievance proceedings initiated by [plaintiff].

"4. While he was affiliated with the university, [plaintiff] was represented by the UPTE union. With the union's assistance, he filed 14 grievances, each of which was addressed pursuant to university and union policy and procedure. For various reasons, each of the grievances was eventually denied or lapsed for failure to timely take the next required step. Each of the grievance denials, then, was considered finally adjudicated by the university. None of the grievances involved the university's whistle blowing procedures. None of [plaintiff's] grievances was appealed by civil writ to a superior court."

On appeal, plaintiff does not argue that count two (wrongful termination in violation of public policy based on FEHA) was not subject to the grievance procedure because it involved the FEHA. The Regents in their respondents' brief suggest FEHA claims may be exempt from the grievance procedure. However, plaintiff does not address this point in his opening or reply briefs. We therefore need not consider it. (*Lewis v. County of Sacramento, supra*, 93 Cal.App.4th at p. 116.)

Plaintiff complains the record is devoid of the terms of the applicable collective bargaining agreement (CBA), how the grievance procedure is invoked, what procedural safeguards are in place, etc. However, he fails to explain why these alleged deficiencies warrant reversal of the judgment. He says the Regents failed to meet their burden of proof as the party moving for summary judgment. In his reply brief, he cites case law that a defendant moving for summary judgment based on an affirmative defense must present evidence as to each element of the defense. However, although the Regents did not put into evidence the CBA agreement, etc., the evidence that the Regents did submit clearly showed the existence of a grievance procedure that was invoked by plaintiff.

Plaintiff argues many of the grievances were not covered by the CBA because some of the grievance rulings said plaintiff lacked standing (because he was no longer employed), or that the requested remedy of compensation for injuries was outside the scope of the grievance, or that the subject of the grievance occurred before ratification of the agreement.[13]

---

[13] The Regents obtained our grant of a motion to augment the record with a stack of grievance letters, without numbering the pages. The Regents tell us to seek out certain case numbers in the letters to find which ones are being referenced. Plaintiff quotes (apparently from several of the letters) and then gives us string citations to invented page numbers.

However, plaintiff fails to describe the grievances and fails to acknowledge that some grievance rulings did rule on the merits of the grievances.

"[D]e novo review [of summary judgment] does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error . . . ." (*Lewis v. County of Sacramento, supra,* 93 Cal.App.4th at p. 116.) "While [the moving party] had the burden of proving its right to summary judgment below, on appeal, [the opposing party], as the appellant, bears the burden of showing error. [Citation.] In the absence of such a showing, we presume the judgment is correct. [Citation.]" (*Frank and Freedus v. Allstate Ins. Co.* (1996) 45 Cal.App.4th 461, 474 [52 Cal.Rptr.2d 678].)

Here, plaintiff has failed to meet his burden on appeal.

Plaintiff cites case law that exhaustion of remedies is not required where it would be futile, inadequate, or would cause irreparable harm. He fails to show that any such problem applies here.

Plaintiff argues the exhaustion doctrine does not apply where there is no procedure that unambiguously sets forth the internal remedies that are to be exhausted. Plaintiff claims the Regents failed to show an unambiguous and quasi-judicial internal procedure. However, the complaint alleged that plaintiff "followed the grievance procedure for members of the University Professionals union, of which plaintiff was a member[,] to its conclusion."

Plaintiff claims he submitted facts establishing that the policies, particularly regarding whistleblowing, were not published or were extremely vague. Plaintiff once again gives us a string citation with no clue as to the contents of the citations. The first cite is to Martinez's deposition testimony that he believed there is a right for a "*Skelly* hearing" (*Skelly, supra,* 15 Cal.4th 194) in medical separation cases. Another citation is to McLean's deposition testimony that medical separation does not require a *Skelly* hearing, but rather a review by a review officer. Another is to the deposition of the Clinic's personnel payroll manager, who said she did not know what the University's whistleblowing policy was and had not noticed any brochures or banners posted on the subject.

We conclude plaintiff has failed to meet his burden as appellant to show grounds for reversal with respect to counts two, three, and four.

## DISPOSITION

The judgment is reversed. The trial court is directed to enter a new order denying the motion for summary judgment but granting summary adjudication in favor of the Regents on counts two, three, and four. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 27(a)(4).)

Davis, J., and Cantil-Sakauye, J., concurred.

A petition for a rehearing was denied December 13, 2005, and the opinion was modified to read as printed above. Respondent's petition for review by the Supreme Court was denied February 22, 2006, S140138.