Filed 3/2/15  Avedian v. Progressive Casualty Co. CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| RAFI AVEDIAN, | B244193 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC455138) |
| v. | |
| PROGRESSIVE CASUALTY INSURANCE CO., et al., | |
| Defendants and Respondents. | |
| JILLIAN MCGUINNESS, et al. | B245747 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC455138) |
| v. | |
| PROGRESSIVE CASUALTY INSURANCE CO., et al., | |
| Defendants and Respondents. | |

APPEALS from judgments of the Superior Court of Los Angeles County, Holly E. Kendig, Judge.   Reversed and remanded.

Mancini & Associates, Marcus A. Mancini and Christopher M. Barnes; Benedon & Serlin, Gerald M. Serlin and Douglas G. Benedon for Plaintiffs and Appellants.

Littler Mendelson (Los Angeles) and Brandie N. Charles; Littler Mendelson (Sacramento) and Michelle L. Christian for Defendants and Respondents Progressive Casualty Insurance Co., Jim Grant and Peter Hawkins.

_____

### INTRODUCTION

Three insurance company claims representatives were terminated for falsification of their timecards. They each filed a complaint against their former employer. Two appellants, Rafi Avedian and Dawn Diaz, alleged wrongful termination in violation of public policy, among other claims, asserting they had been terminated for complaining about their employer's business practices that allegedly violated the Insurance Code. The third appellant, Jillian McGuinness, alleged the employer had failed to accommodate her disability and failed to engage in the interactive process, among other claims. The insurance company filed motions for summary judgment, and the trial court granted each of these motions. This appeal followed. As we shall explain, triable issues of fact exist as to the appellants' respective claims. We conclude the trial court erred in granting summary judgment for Progressive, and accordingly reverse.

### FACTUAL AND PROCEDURAL SUMMARY

**1.  Appellants' Employment with Progressive.**

Rafi Avedian, Dawn Diaz, Jillian McGuinness and Kristin Giarletto worked together as claims specialists in the Sherman Oaks office of Progressive Casualty Insurance Company (Progressive).[1] Claims specialists negotiate on Progressive's behalf

---

[1]  Avedian, Diaz, McGuinness and Giarletto filed separate complaints against Progressive, but their actions were consolidated in the trial court. Each filed a notice of appeal. Kristin Giarletto subsequently dismissed her appeal and is no longer a party (although she is discussed as relevant). In an order dated September 24, 2013, we denied

and settle claims with Progressive's funds.  Beginning in May 2009, the branch manager of the Sherman Oaks office was Peter Hawkins.[2]  Marcia Meyers and Laura Doran were supervisors in the office.

In its Code of Business Conduct and Ethics (Code), Progressive states: "We operate in a highly regulated industry" and "are subject to many laws and regulations designed to protect the communities and people we serve."  "These include state insurance laws and federal state and local laws of general application.  [¶] You are responsible for complying with all applicable laws and regulations in your work for Progressive."[3]

Claims specialists were required to review the Code each year, and Avedian and Diaz did so.

---

joint motions to consolidate the appeals but ordered the court may consider appeals B244193 (relating to Avedian) and B245747 (relating to Diaz and McGuinness) concurrently for purposes of oral argument and decision.

[2]     Before Hawkins, Charlie Neville was the branch manager of the Sherman Oaks office, but when Progressive terminated Neville's employment, Hawkins took his place.

[3]      In fact, under the heading "Voicing Concerns and Reporting Possible Violations," Progressive's Code further states:  "It is your responsibility under this Code to speak up whenever you know of or suspect a possible Code violation.  As you consider this responsibility, keep in mind: [¶] Speaking up is not optional.  It is **your duty to speak up** anytime you become aware of a concern, even if you aren't sure whether the Code has been violated.  [¶] Speaking up is **not** risky.  As explained in detail below, **you can speak up anonymously and are protected from retaliation** whenever you speak up in good faith.  [¶]  Speaking up is not harmful to Progressive.  Reporting concerns **helps keep our Company strong** by allowing us to address issues promptly and remedy problems quickly."  (Original emphasis.)

The Code provides a "confidential, toll-free Alertline" (accessible by telephone or online) "if you'd like confidential assistance on ethics and compliance issues, to anonymously report suspected violations of this Code, or if you believe that ethics and compliance issues raised through other channels have not been resolved."   Initially, however, the Code indicates:  "You might start with your manager or your Human Resources (HR) representative, but you should feel free to consult any of Progressive's managers or business leaders."

A.     **Insurance Code Section 790.03**.

The purpose of Insurance Code section 790 et seq. is to "regulate trade practices in the business of insurance . . . by defining, or providing for the determination of, all such practices in this State which constitute unfair methods of competition or unfair or deceptive acts or practices and by prohibiting the trade practices so defined or determined." (Ins. Code, § 790 [all statutory references are to the Insurance Code unless otherwise indicated].) "No person shall engage in this State in any . . . unfair method of competition or an unfair or deceptive act or practice in the business of insurance." (§ 790.02.) Section 790.03 lists conduct expressly "define[d] as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance." As relevant here, subdivision (h) of section 790.03 "enumerates sixteen claims settlement practices that, when either knowingly committed on a single occasion, or performed with such frequency as to indicate a general practice, are considered unfair claims settlement practices and are, thus, prohibited" by the Insurance Code. (Cal. Code Regs., tit. 10 (Regs.), § 2695.1, subdivision (a); § 790.03, subd. (h).)

The unfair practices listed in subdivision (h) of section 790.03 include: "(2) Failing to acknowledge and act reasonably promptly upon communications with respect to claims arising under insurance policies[;] [¶] (3) Failing to adopt and implement reasonable standards for the prompt investigation and processing of claims arising under insurance policies[;] [¶] (4) Failing to affirm or deny coverage of claims within a reasonable time after proof of loss requirements have been completed and submitted by the insured[;] [¶] (5) Not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims in which liability has become reasonably clear[;] . . . [and] (13) Failing to provide promptly a reasonable explanation of the basis relied on in the insurance policy, in relation to the facts or applicable law, for the denial of a claim or for the offer of a compromise settlement . . . ."

As stated in the preamble of the "Fair Claims Settlement Practices Regulations" (Regs., § 2695.1, subd. (a)), "The Insurance Commissioner has promulgated . . . regulations in order the accomplish the following objectives: [¶] (1) To delineate certain

4

minimum standards for the settlement of claims . . . [and] (2) to promote the good faith, prompt, efficient and equitable settlement of claims on a cost effective basis . . . ." These regulations mandate compliance with multiple strict deadlines. For example, unless the claimant has initiated legal action, the insurer "shall immediately, but in no event more than fifteen (15) calendar days" later, (1) acknowledge receipt of any claim (or pay the claim) (Regs., § 2695.5, subd. (b)(1)); (2) provide the claimant necessary forms, instructions and reasonable assistance, including but not limited to specifying the information needed for proof of claim (Regs., § 2695.5, subd. (b)(2)); and (3) begin any necessary investigation (Regs., § 2695.5, subd. (b)(3)).

Upon receiving any communication from a claimant regarding a claim that "reasonably suggests a response is expected," in the absence of notice of legal action by the claimant, the insurer "shall immediately, but in no event more than fifteen (15) calendar days" later, furnish the claimant with a "complete response based on the facts then known . . . ." (Regs., § 2695.5, subd. (b).) Upon receiving proof of claim, every insurer "shall immediately, but in no event more than forty (40) days later," accept or deny the claim (and document the claim file as specified in the regulation) (Regs., § 2695.7, subd. (b)), or if more time than the time allotted in subsection (b) of section 2695.7 is needed, the insurer shall provide written notice that more time is needed within the same timeframe, and must specify the additional information required to make a determination and state any continuing reason for the insurer's inability to make a determination (Regs., § 2695.7, subd. (c)(1)). Thereafter, written notice "shall be provided every thirty (30) calendar days" until a determination is made or notice of legal action is served, and if the determination cannot be made until some future event occurs, the insurer must comply with this continuing notice requirement by advising the claimant of the situation and providing an estimate as to when the determination can be made. (*Ibid.*) Upon acceptance of a claim (in whole or in part), and upon receipt of a properly executed release when necessary, every insurer (unless certain specified exceptions apply) "shall immediately, but in no event more than thirty (30) calendar days late, tender

5

payment" or otherwise take action to perform on the claim obligation.[4]  (Regs., § 2695.7, subd. (h).)

Pursuant to these regulations, the insurer "shall provide thorough and adequate training regarding the regulations to all of their claims agents" and "shall certify that their claims agents have been trained regarding these regulations and any revisions thereto." (Regs., § 2695.6, subd. (b).)  Compliance with this mandatory obligation requires annual written certification that the entity's "claims adjusting manual contains a copy of these regulations and all amendments thereto" and that "clear written instructions regarding the procedures to be followed to effect proper compliance with this subchapter were provided to all its claims agents . . . ."  (*Id.*, § 2695.6, subd. (b)(1) & (2).)

**B.      Appellants' Workload and Complaints to Progressive.**

The claims representatives were responsible for knowing the requirements in the Insurance Code that pertained to their work.  In particular Avedian acknowledged having received and read Progressive's policies regarding those obligations.

Avedian, Diaz and the other claims representatives in the Sherman Oaks office were handling about 270 files on average; they looked at the claims numbers for the other

---

[4]      Some additional mandatory deadlines include the following:

Except where a claim has been settled (or a claimant is represented by counsel), the insurer "shall provide written notice of any statute of limitation or other time period requirement upon which the insurer may rely to deny a claim" "not less than sixty (60) days prior to the expiration date" except that, if notice is received within that sixty days, then notice of the expiration date must be given to the claimant "immediately" and if the claim is a first-party claim involving an uninsured motorist, the notice shall be given at least 30 days prior to the expiration date or, if notice is first received within that 30 days, such notice shall be given "immediately." (Regs., § 2695.7, subd. (f).)

Upon receipt of any inquiry from the Department of Insurance concerning a claim, the insurer "shall immediately, but in no event more than twenty-one (21) calendar days of receipt of that inquiry," furnish a complete written response based upon the facts then known, addressing all issues raised and providing copies of all documentation and claim files requested.  (Regs., § 2695.5, subd. (a).)

6

Progressive offices and saw that the Sherman Oaks office had the highest workload out of the entire state "by far."

On several occasions, Diaz complained to her supervisor that the workload was "completely unmanageable." She complained about "being swamped," and she later stated, "[I was] not able to properly handle my files . . . , [and it] was getting to the point where people were not even responding to their demands in time. . . ." Diaz also complained there were times when she was ready to write up her evaluation of a claim up to the policy limits—"do[ing her] best to protect the insured" and "prevent bad faith from happening[,]" but she was not permitted to do so and what she was told to do instead did not "seem like the most ethical way[] of handling claims . . . ."

Diaz and Giarletto also complained to Human Resources Consultant James Kiedaisch at a group meeting with other claims specialists in the Sherman Oaks office. They told Kiedaisch how upset they were about claims volumes and that they were "just so overwhelmed with work" that they were "falling behind[,]" even though they were "working as hard as [they] could" and sometimes staying late. It was a "terrible work environment at the time. People were crying at their desk[s], leaving the office . . . shaking." Giarletto expressed her concern that the high workload might be deemed impermissible by the Department of Insurance.

Toward the end of 2008 and into 2009, Avedian complained at least 10-15 times to branch manager Neville about the "enormous amount of work" and said it was "impossible to control." Avedian also complained about the workload to supervisors Myers (about 10 times) and Doran as well. Neville said there was "nothing we can do" and Myers told Avedian to "do his best." When Hawkins replaced Neville in May 2009, Avedian complained twice to him, but the high workload continued through the summer of 2009.

When he replaced Neville, Hawkins spoke with employees and saw the high incoming claim volume was impacting morale; he saw that other branches did not have as high an inventory as the Sherman Oaks office.

Despite the complaints, the office's workload conditions changed.

7

**2.** **McGuinness's Disability.**

In February 2009, McGuinness informed Progressive she had experienced a panic attack on her way to work.[5]  Thereafter, she was diagnosed with bipolar disorder, anxiety and depression.  On February 12, 2009, she requested, and Progressive granted, disability leave under the California Family Rights Act (CFRA).  Her CFRA leave was exhausted on May 4, 2009.  At her request, Progressive granted her further personal leave.  During this time, her doctor prescribed a number of medications, had to increase dosages and scheduled McGuinness to attend an intensive outpatient program three times per week. McGuinness remained in contact with Progressive's Leave Specialist Patricia Turner until her leave time ran out.   Before her leave time expired, McGuinness contacted Human Resources Consultant Kiedaisch to discuss her return to work and to inquire about further accommodations, including a transfer to the Valencia office and reporting to a supervisor other than Myers.

Thereafter, Progressive (through Turner) told McGuinness she could not transfer to Valencia because the office was not a casualty office.[6]  Progressive extended McGuinness's personal leave to June 1, 2009, indicating it would not hold her position open after that, and granted her request for a new supervisor.

Upon her return in June 2009, McGuinness continued to see her doctor on a weekly or biweekly basis; her new supervisor (Laura Doran) knew of the appointments and discussed them with McGuinness.  She also discussed her condition with the new branch manager (Hawkins).  McGuinness told Doran she was still having a difficult time with work, her doctor was still adjusting her medications, and she felt scattered and unfocused; Doran told McGuinness:  "We're trying to be understanding, but at some

---

[5]    Her commute reportedly averaged 1 ¾ hours each way.

[6]    The office later closed in October 2010 (16 months after McGuinness's return to work).

8

point you're going to have to perform, and that's not going to be an excuse anymore."[7] McGuinness's workload increased upon her return. McGuinness believed she had returned to work sooner than she should have.

**3.  Appellants' Termination for Timecard Falsification.**

Progressive's Code requires employees to keep timecards, accurately reflecting the hours worked. Non-exempt employees are required to complete and submit a timecard for each two-week pay period. Progressive follows an "honor system" requiring each employee to keep track of hours worked in a manner enabling easy retrieval upon request. Employees are to report errors promptly to their supervisor or human resources representative. Intentional misrepresentation, such as the failure to report time off, is a violation of the Code; falsification of timecards is identified as grounds for immediate termination under Progressive's policies. Integrity is listed as the first of Progressive's "Core Values."

On September 22, 2009, Human Resources Manager Jolane Davis sent an email to claims specialists in which she stated it was the employee's responsibility to accurately report their hours worked on their time cards in order for Progressive to pay them properly. She stated that to work but not report the time and to not work but report the time were both violations of the Code which could subject the employee to disciplinary action.

On September 30, 2009, while "Progressive's leadership" from the Sherman Oakes Branch Office was attending a conference in Irvine, Claims Specialists McGuinness, Avedian, Giarletto, Diaz and Caitlin Lassen were allegedly "away from the Progressive office for an extended amount of time, leaving other Claims Specialist[s] to cover their desks and calls." Claim Specialist Danielle Sweet complained to Peter Hawkins, Sherman Oaks Branch Manager, about the claims representatives' extended absences on October 2, 2009. Sweet also complained that three other employees,

---

[7]    As we will explain, the trial court erroneously excluded this evidence.

Margaret Chavez, Lusine Marakian and Mia Lipton had also taken an "extended lunch" that day.

Claims specialists were entitled to a 30-minute lunch break, and when Hawkins reviewed employee timecards for September 30, 2009 date, he saw that each of these employees had recorded only a 30-minute lunch break.

On October 8, 2009, Hawkins re-sent Davis's September 22, 2009 email to the claims specialists in the Sherman Oaks office. Hawkins also advised claims specialists, if they had not accurately documented their hours worked on their timecards, they should correct the timecards to make them accurate. He indicated an "overstatement" of hours was not only an issue of a falsification of a record but also an "Integrity" violation and a terminable offense under the Code.

None of the claims representatives with inaccurate timecards made any changes to their timecards.

Based on Sweet's complaint and Hawkins's preliminary findings, on October 21, 2009, Progressive initiated a formal investigation, requesting the timecards of these employees, along with "time data" (phone records, swipe records, computer activity records and garage in and out records) for Diaz, Giarletto, Avedian, McGuinness and Lassen for September 30, 2009.

On October 27, 2009, Hawkins held a branch meeting and addressed the proper procedures for completing timecards, emphasizing the importance of accurately reporting hours worked. None of the appellants came forward to make any changes. Hawkins acknowledged the employees in the Sherman Office seemed to view the October email as establishing a new expectation with respect to timekeeping.

Avedian's timecard for the period including September 30, 2009 indicated that he had worked nine hours (including one hour of overtime) on September 30, 2009— commencing work at 7:00 a.m., stopping at noon, resuming at 12:30 p.m., and concluding at 4:30 p.m. Diaz's timecard indicated Diaz had worked an eight-hour day on September 30, 2009, commencing work at 7:30 a.m., stopping work at 11:00 a.m., resuming at 11:30 a.m., and concluding at 4:00. McGuinness's timecard for the same date reflected an

10

eight-hour work day, commencing at 9:00 a.m., stopping at 11:30 a.m., resuming at noon, and concluding at 5:30 p.m. Giarletto's timecard showed that she had worked nine hours on September 30, 2009 (including one hour of overtime), commencing work at 8:00 a.m., stopping work at 11:30 a.m., resuming at noon, and concluding at 5:30 p.m.

The timecards for the other four employees that were investigated – Lassen, Chavez, Marakian and Lipton – also reflected that they all claimed to have worked an eight-hour day on September 30, 2009.

On November 11, 2009, Human Resources Manager Davis and Senior Claims Director Grant interviewed Diaz and McGuinness (separately); Hawkins and Grant interviewed Avedian and Giarletto (separately). Lassen, Chavez, Lipton were also interviewed on November 11.[8]

Based on Progressive's investigation and interviews with Avedian, Diaz, McGuinness and Giarletto, Progressive concluded all four had deliberately falsified their September 30, 2009 timecards. They all left the Sherman Oaks office at about 11:40 a.m. and had gone to lunch together at a popular casual dining restaurant. They returned to the office between 1:42 and 1:51 p.m. Progressive determined Avedian had worked 6 hours and 33 minutes (not the 9 hours he claimed); Diaz worked 6 hours and 25 minutes (not the 8 hours she claimed); McGuinness worked about 5 hours and 25 minutes (not the 8 hours she claimed); and Giarletto worked 5 hours and 17 minutes (not the 9 hours she had claimed).

The investigation revealed that on September 30, 2009, Lassen, Chavez, Lipton, and Marakian went to lunch with another employee, April Brandenburg, at a Japanese restaurant. The timecards for Lassen, Chavez, Lipton, and Marakian were inaccurate. Lassen worked 7 hours and 35 minutes, rather than the 8 hours she had claimed on her timecard; Chavez worked 7 hours and 30 minutes, rather than the 8 hours she had claimed; Marakian worked 7 hours and 12 minutes rather than the 8 hours reflected on

8    Progressive's investigatory notes reflect Lusine Marakian was on family leave at the time the interviews were conducted and thus was not interviewed on November 11, 2009.

11

her timecard; and Lipton had worked a full 8 hours, but had not accurately recorded the time she came to work and the time she left in the evening.

On November 12, 2009, Progressive terminated Avedian, Diaz, McGuinness and Giarletto for timecard falsification.[9]  According to the declaration of Human Resources Consultant James Kiedaisch, who participated in the investigation of the timecard discrepancies, Claims Specialists Lassen, Chavez, Marakian and Lipton were not terminated for the inaccuracies in their respective timecards pertaining to September 30, 2009 "because the Company determined that the minimal time discrepancies involved amount only to sloppy record keeping rather than an intentional integrity violation of the Code of Business Conduct and Ethics.  Nonetheless, these employees were still disciplined through written and/or verbal warning."

**4.      Appellants' Civil Action.**

Avedian, Diaz and McGuinness (along with Giarletto) each filed a complaint against Progressive.[10]  Although each appellant asserted multiple claims, the only claim at issue in Avedian's and Diaz's appeals is for wrongful termination in violation of public policy (Lab. Code, § 1102.5; Ins. Code, § 790.03; Bus. & Prof. Code, § 17200 et seq.). In McGuinness's appeal, the only causes of action at issue are for failure to accommodate disability and failure to engage in good faith in the interactive process (Gov. Code, § 12940, subds. (m) & (n)).

More particularly, both Avedian and Diaz alleged that, during the six months before they were terminated, they complained to Progressive managers and supervisors that Progressive was actually or potentially violating statutes regarding unfair/deceptive insurance business practices and claims settlement practices, including but not limited to section 790.03, subdivision (h), and Business and Professions Code section 17200 et seq.

---

[9]      Avedian and Diaz had worked for Progressive for about six years; McGuinness had worked for Progressive for less than three years.

[10]      Appellants also named as defendants Grant and Hawkins, but do not appeal from the judgments entered as to these individual defendants.

Avedian and Diaz alleged Progressive's managers and supervisors freely admitted the caseload in the Sherman Oaks office (about 250 cases and as many as 270 cases) was "completely unmanageable" but warned the only way to meet expectations was to be "'perfect'" in the claims handling process and "'complainers are the first to lose their jobs.'" Avedian and Diaz further alleged public policy, as expressed in Labor Code section 1102.5, was to prohibit employers from discriminating against, retaliating against and terminating an employee for complaining of unlawful activity, such as unfair and deceptive insurance business practices (including but not limited to violations of section 790.03, subdivision (h) and Business and Professions Code section 17200 et seq.), and this public policy was designed to protect all employees and promote the general well being of the community at large. Consequently, they alleged, Progressive's actions in retaliating against and terminating them were wrongful and in violation of the express public policy of this state.

According to McGuinness's complaint, as a result of her work environment at Progressive, she developed, aggravated and/or sustained bipolar disorder, anxiety and depression. Beginning in or around February 2009 and continuing at least through November 12, 2009, Progressive discriminated against, harassed and retaliated against McGuinness on the basis of her disabilities by failing to determine the extent of her disabilities and how they could be accommodated; failing to take affirmative steps to inform her of job opportunities within the company; failing to consider her for and move her into an opening for which she was qualified and could handle subject to her disabilities; failing to engage in a timely, good faith, interactive process with her to determine effective reasonable accommodations; and wrongfully terminating her on November 12, 2009, for the pretextual reason she had "'falsified documentation' and stolen time."

After answering and conducting discovery, Progressive filed motions for summary judgment as to all of the appellants' claims. With respect to Avedian's and Diaz's

13

wrongful termination in violation of public policy claims, Progressive argued neither Avedian nor Diaz could establish they engaged in protected activity.[11]

In moving for summary adjudication of McGuinness's claim for failure to accommodate, Progressive argued the undisputed evidence established Progressive had provided her with reasonable accommodation as she had been permitted to take leave and had been assigned a different supervisor. Similarly, in moving for summary adjudication of her claim for failure to engage in good faith in the interactive process, Progressive argued the undisputed evidence demonstrated Progressive had engaged in good faith in the interactive process.

Avedian and Diaz argued Progressive wrongfully terminated their employment in retaliation for their complaints about Progressive's business practices and the stated reason for their termination was pretextual. McGuinness argued Progressive's accommodations were insufficient and Progressive had ignored her continued efforts to communicate the inadequacy of the accommodations provided.[12] Over the appellants' opposition, the trial granted Progressive's motions for summary judgment in their entirety.

---

[11]    Actually, in its notices of motion for summary judgment as to Avedian's and Diaz's wrongful termination causes of action, Progressive framed the issue as follows: "Because Plaintiff premises [his or her] cause of action for retaliation in violation of public policy upon a violation of . . . Labor Code section 1102.5, this claim fails to the extent [his or her] Labor Code section 1102.5 claims fails." As to the Labor Code section 1102.5 causes of action, Progressive asserted its entitlement to summary adjudication on the ground(s) that "Plaintiff's cause of action for violation of . . . Labor Code section 1102.5 et seq. fails because the undisputed material facts establish that Progressive did not enforce any rule, regulation or policy preventing an employee from disclosing information to a government agency. The undisputed material facts also establish that Plaintiff did not engage in a protected act under . . . Labor Code [section] 1102.5 et seq as Plaintiff did not complain to a government or law enforcement agency. There is also no triable issue of fact that Defendant's actions were based upon legitimate business reasons and Plaintiff cannot show evidence of pretext."

[12]    Progressive also filed objections to the appellants' evidence, and the trial court sustained a number of these objections. Each appellant challenges a number of these evidentiary rulings on appeal.

McGuiness, Diaz and Avedian appeal from the judgments subsequently entered.

## *DISCUSSION*

### I.      Standard of Review.

"[T]he party moving for summary judgment bears the burden of persuasion that there is no triable issue of material fact and that he is entitled to judgment as a matter of law." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850 (*Aguilar*), fn. omitted; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334 (*Guz*).)  "Once the [movant] has met that burden, the burden shifts to the [other party] to show that a triable issue of one or more material facts exists as to that cause of action . . . ."  (Code Civ. Proc., § 437c, subd. (p)(2); *Aguilar, supra*, 25 Cal.4th at p. 850.)  The party opposing summary judgment "may not rely upon the mere allegations or denials of its pleadings," but rather "shall set forth the specific facts showing that a triable issue of material fact exists . . . ."  (Code Civ. Proc., § 437c, subd. (p)(2).)  A triable issue of material fact exists where "the evidence would allow a reasonable trier of fact to find the underlying fact in favor of the party opposing the motion in accordance with the applicable standard of proof." (*Aguilar, supra*, 25 Cal.4th at p. 850.)

"On appeal after a motion for summary judgment has been granted, we review the record de novo, considering all the evidence set forth in the moving and opposition papers except that to which objections have been made and sustained." (*Guz, supra*, 24 Cal.4th at p. 334.)  We consider all the evidence set forth in the moving and opposition papers, except that evidence to which objections have been made and sustained.  (*Ibid*.)  However, "[w]e do not resolve conflicts in the evidence as if we were sitting as the trier of fact. [Citation.]  Instead, we draw all reasonable inferences from the evidence in the light most favorable to the party opposing summary judgment. [Citation.]" (*Nadaf-Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 961.)

This appeal requires an analysis of what inferences may be drawn from the admissible evidence.  A material issue of fact may not be resolved based on inferences, if contradicted by other inferences or evidence.  (See Code Civ. Proc., § 437c, subd. (c); *Aguilar, supra*, 25 Cal.4th at p. 856.)  "[T]he court may not weigh the plaintiff's evidence

15

or inferences against the defendants as though it were sitting as the trier of fact," but must determine the question of law of "what any evidence or inference *could show or imply to a reasonable trier of fact*." (*Aguilar*, at p. 856.) Where the evidence and inferences would allow a reasonable trier of fact to find the underlying fact in favor of a plaintiff in accordance with the applicable standard of proof, then a defendant's motion for summary judgment must be denied. (*Id*. at p. 850.)

With respect to appellate review of the trial court's evidentiary rulings on the evidence submitted in connection with the motion, our Supreme Court has not yet determined whether we review the trial court's evidentiary rulings for abuse of discretion or de novo. (See *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535 ["we need not decide generally whether a trial court's rulings on evidentiary objections based on papers alone in summary judgment proceedings are reviewed for abuse of discretion or reviewed de novo"]; but see *Miranda v. Bomel Construction Co., Inc.* (2010) 187 Cal.App.4th 1326, 1335 ["'the weight of authority holds that an appellate court reviews a court's final rulings on evidentiary objections by applying an abuse of discretion standard'"].) We need not decide this issue here, as our conclusion would be the same applying either standard of review.

## II. The Avedian (B244193) and Diaz (B245747) Appeals: Wrongful Termination in Violation of Public Policy.

Avedian's and Diaz's claims for wrongful termination are based on their complaints of illegal business practices in violation of section 790.03. To establish such a claim, a plaintiff must prove: (1) the plaintiff was employed by the defendant; (2) the defendant employer discharged the plaintiff (or took other adverse action); (3) the termination of the plaintiff's employment was a violation of public policy—that is, a nexus exists between the termination and the employee's protected activity (in this case, the internal reporting of an unlawful business practice) such that the protected activity was a substantial motivating reason for the plaintiff's discharge; and (4) the discharged

16

caused the plaintiff harm. (See *Holmes v. General Dynamics Corp.* (1993) 17 Cal.App.4th 1418, 1426; see also CACI No. 2430.)[13]

"When a plaintiff alleges retaliatory employment termination . . . [such] as a claim for wrongful employment termination in violation of public policy, and the defendant seeks summary judgment, California follows the burden-shifting analysis of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792 to determine whether there are triable issues of fact for resolution by a jury. . . . In the first stage, the 'plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action.' [Citation.]" (*Loggins v. Kaiser Permanente Internat.* (2007) 151 Cal.App.4th 1102, 1108-1109 (*Loggins*).)

If the employee successfully establishes these elements, "the burden shifts to the employer to provide evidence that there was a legitimate, nonretaliatory reason for the adverse employment action. [Citation.]" (*Loggins, supra*, 151 Cal.App.4th at p. 1109.) If such a legitimate reason is shown, the burden shifts back to the employee to provide "'substantial responsive evidence' that the employer's proffered reasons were untrue or pretextual. [Citation.]" (*Ibid*.)

### A. Prima Facie Case.

#### 1. Protected Activity.

Our Supreme Court has determined that, in a claim of wrongful termination in violation of public policy, the employee's protected activity must fall into one of four categories: the employee must have (1) refused to violate a statute; (2) performed a statutory obligation; (3) exercised a constitutional or statutory right or privilege; or (4)

---

13     As the use notes to CACI No. 2430 (elements of claim for wrongful termination in violation of public policy) state: "The judge should determine whether the purported reason for firing the plaintiff would amount to a violation of public policy. (See *Gantt v. Sentry Insurance* (1992) 1 Cal.4th 1083, 1092 [4 Cal.Rptr.2d 874, 824 P.2d 680]; overruled on other grounds in *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 80 fn. 6 [78 Cal.Rptr.2d 16, 960 P.2d 1046] (*Green*).) The jury should then be instructed that the alleged conduct would constitute a public-policy violation if proved."

reported a statutory violation for the public's benefit. (*Green*, *supra*, 19 Cal.4th at p. 76.) Courts have routinely found that employees have engaged in a protected activity when they have complained about workplace circumstances or policies which violate statutes, regulations or constitutional provisions. (See, e.g., *Scott v. Phoenix Schools, Inc.* (2009) 175 Cal.App.4th 702, 709 [employee was discharged for refusing to violate an administrative regulation limiting minimum teacher-student ratios]; *Gould v. Maryland Sound Industries, Inc.* (1995) 31 Cal.App.4th 1137, 1149 [employee fired for reporting violations of overtime laws to management]; *Collier v. Superior Court* (1991) 228 Cal.App.3d 1117, 1123 [employee discharged after reporting to management that company executives were violating bribery, embezzlement, and tax laws]; *Hentzel v. Singer Co.* (1982) 138 Cal.App.3d 290, 298 [employee was discharged for protesting unsafe work conditions]; *Petermann v. International Brotherhood of Teamsters* (1959) 174 Cal.App.2d 184, 188-189 [employer insisted an employee perjure himself].)

Progressive concedes section 790.03 constitutes a fundamental statutory provision designed for the public's benefit as required. (*Tameny v. Atlantic Richfield Co.* (1994) 7 Cal.4th 1238, 1256-1257 [the tort of wrongful discharge in violation of public policy is not a vehicle for enforcement of an employer's internal policies or the provisions of its agreements with others; the discharge must implicate a "fundamental public policy embodied in a statute or constitutional provision"]; *Green, supra,* 19 Cal.4th at p. 80.) However, Progressive claims neither Avedian nor Diaz engaged in protected activity because a complaint about a "heavy workload does not translate into unlawful conduct violative of statutory insurance claims handling requirements." We disagree.

Here appellants' ability to prove they were engaged in a protected activity depends on whether they reported to Progressive that its business practices violated the Insurance Code. More specifically, the issue is whether appellants' complaints about their unmanageable workload and their inability to timely complete their work could reasonably be interpreted as complaints that the volume of work at Progressive had resulted in the violation of Insurance Code provisions governing the prompt settlement of claims.

18

In our view, the admissible evidence presented in connection with the summary judgment motions gives rise to a reasonable inference that appellants' complaints informed Progressive of its violation of its obligations under the Insurance Code. The statute and related insurance regulations at issue promote good faith and timely settlement of claims. (See § 790.03 [prohibiting unfair or deceptive acts and practices]; 10 Cal. Code Regs., §§ 2695.1, 2695.2, 2695.3, 2695.5, 2695.7, 2695.12 [promoting good faith, prompt, efficient and nondiscriminatory equitable settlement of claims].) Progressive was aware of these legal obligations related to claims settlement, and was required to train its Claims Specialists about those requirements. Appellants were knowledgeable of these claims-handling obligations imposed by the law.

Diaz, Avedian, McGuiness and Giarletto all held the same position at Progressive as a " Claims Specialist" and all performed the same job functions. They regularly interacted with each other in the workplace and socially outside of work. In fact, on September 30, 2009 – the date they allegedly misreported the time they worked – they went to lunch together. This evidence gives rise to the inference that appellants and Giarletto discussed among themselves the high workload and the challenges they faced in promptly responding to insurances claims.

In addition, in the months before they were terminated, appellants all communicated essentially the same complaint to their supervisors at Progressive: they could not properly and timely handle their claims files because of the unmanageable volume of work.[14] They made these complaints repeatedly. They complained

---

[14]    We agree with appellants that the trial court erred in excluding evidence of their complaints on hearsay grounds; the appellants' complaints about their workload were not offered for the truth of the matter stated. Instead the evidence was offered to prove that appellants were engaged in a protected activity—complaining about a violation of statute. Evidence that these words were spoken is admissible as nonhearsay evidence. (See *People v. Fields* (1998) 61 Cal.App.4th 1063, 1068–1069; *People v. Smith* (2009) 179 Cal.App.4th 986,1003 ["Written or spoken words offered as original evidence rather than for their truth are generally referred to as 'operative facts' and are admissible as non-hearsay."]. )

19

individually and during group meetings.  Giarletto even went so far as to question whether the high workload might be deemed impermissible by the Department of Insurance.[15]  The sum and substance of appellants' complaints directly related to the unfair practices listed under section 790.03, subdivision (h), even though appellants did expressly name the regulation or statute that they suggested Progressive violated by its workload conditions.  Indeed, a plaintiff is not required to identify the precise statute or regulation to prove he or she reported a statutory violation for the public's benefit.  (See *Green*, *supra,* 19 Cal.4th at p. 85 [general reports of suspected wrongful activity may constitute protected activity, and an employee need not prove an actual violation of law].)

*Green* is instructive on this point.  The defendant in *Green* manufactured and supplied airplane components for military and civilian aircraft.  Green worked for defendant as quality control inspector.  In 1990, Green claimed he noticed that defendant was sending airplane parts to its clients even though, according to Green, some of those parts failed the inspections his team performed.  On several occasions over the next year, Green objected to defendant's practice to supervisory and management personnel and to the company president.  After he was fired in 1991, Green filed a wrongful termination action against defendant.  Green alleged that defendant terminated him in retaliation for his complaints about its inspection practices.  (*Green*, *supra,* 19 Cal.4th at pp. 72-73.)  The defendant in *Green*, like Progressive in this case, claimed that Green had failed to engage in a protected activity, because, among other arguments, Green's complaints about the safety inspections focused on defendant's internal practices and procedures, and did not amount to a complaint that defendant's conduct violated any federal law.  Our Supreme Court disagreed, concluding that "by informing defendant that he believed it was shipping defective parts for use in passenger aircraft, [Green] gave defendant adequate notice that his concern involved potentially significant public policy matters

---

15    According to Giarletto, the "gist" of her manager's response to that question was that "she [the manager] wasn't exactly sure it was allowed by the Department of Insurance, to handle that many claims."

because the FAA requires manufacturers to establish quality control procedures for the component parts they produce." (*Id*. at p. 85.) The Supreme Court concluded, "[t]hus, unlike some cases in which an employer's violation of its own internal procedures does not implicate public policy . . . , the internal quality control procedures at issue in this case are part of a statutory and regulatory scheme established by Congress and the FAA, designed to ensure the manufacture of safe aircraft." (*Ibid*.)

So too here, the unmanageable workload at Progressive that purportedly caused the claims specialists to fail to timely complete their work implicated the statutory and regulatory scheme governing the good faith, prompt processing of insurance claims. In the context of appellants' employment as claims specialists in the highly regulated insurance industry, it is reasonable to infer that the complaints at issue here constituted complaints about unlawful business practices. Because the evidence and inferences from the evidence could allow a trier of fact to find that appellants were reporting a violation of the law, a triable issue of material fact exists on the issue of whether appellants engaged in a protected activity.

### 2. Adverse Employment Action.

This element is undisputed as both Avedian and Diaz were terminated.

### 3. Causal Link.

Avedian and Diaz presented evidence they had worked for Progressive for approximately six years, as well as evidence they had been making their complaints within the six months preceding their terminations. (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 615 ["'The causal link may be established by an inference derived from circumstantial evidence, "such as the employer's knowledge that the [employee] engaged in protected activities and the proximity in time between the protected action and allegedly retaliatory employment decision."' [Citation.]"].)

### B. Legitimate, nonretaliatory reason.

Progressive presented evidence Avedian and Diaz were terminated for falsifying their timecards, satisfying its burden of producing a legitimate, nonretaliatory reason for their terminations. (*Loggins, supra,* 151 Cal.App.4th at p. 1109.) Progressive argues that

21

although appellants were given the opportunity to correct their time cards, they failed to do so.

## C. Pretext.

Because Progressive presented a legitimate, nonretaliatory reason for appellants' terminations, the burden shifted back to Avedian and Diaz to provide substantial responsive evidence that Progressive's proffered reasons were untrue or pretextual. (*Loggins, supra*, 151 Cal.App.4th at p. 1109.)

To that end, appellants contend that Progressive's stated reason for their termination is a pretext because Progressive did not terminate the other employees – Lassen, Chavez, Lipton and Marakain – who had also misreported their work time for September 30, 2009. Appellants point out that these other claims specialists were only issued warnings for their timecard inaccuracies. Appellants also assert that there is no evidence that any of the claims specialists who were investigated for the timecard discrepancy corrected the errors in the timecards. Appellants argue that the difference between the claims specialists who were fired for falsifying timecards and those who were not fired for the recordkeeping mistake is that appellants (and Giarletto) had complained about the unmanageable workload at the office. Appellants maintain that the fact that they were singled out for termination demonstrates that Progressive's proffered reason for terminating their employment is a pretext.

Progressive counters appellants' pretext argument, responding that Lassen, Chavez, Lipton and Marakain, on the one hand, and appellants, on the other hand, were not similarly situated. Progressive claims that Lassen, Chavez, Marakian and Lipton were not terminated for the inaccuracies in their respective timecards (ranging from 25 to 48 minutes) because Progressive determined that Lassen's, Chavez's, Marakian's and Lipton's timekeeping errors were "minimal time discrepancies" that reflected "sloppy record keeping" rather than an "intentional integrity violation." In contrast, Progressive asserts that appellants committed falsification of time cards to such a "significant degree" and under "such circumstances" that Progressive determined their conduct to be "intentional" and thus constitute an integrity violation.

22

Progressive's response is problematic; it does not resolve the issue of pretext. The only uncontroverted distinction between the appellants and Lassen, Chavez, Marakian and Lipton is the amount of the time discrepancy – a maximum of 48 minutes for those who received warnings compared to a maximum of more than two hours for those who were terminated. However, Progressive has never claimed that the amount of the time discrepancy justified the different discipline. In fact, Branch Manager Hawkins testified that he was unaware of any company policy establishing that a certain time discrepancy on a timecard would establish "intentional" timecard falsification while a smaller discrepancy would constitute only "sloppy record keeping." Indeed, whether an employee misreports her time worked by 30 minutes or an hour and 30 minutes, the amount of the time discrepancy, standing alone, does not resolve the issue of her intent in reporting her time. On appeal, Progressive does not argue that the amount of the time discrepancy was solely indicative of intent to falsify the timecard; Progressive refers to other unspecified "circumstances" in conjunction to the time discrepancies as the basis of its conclusion that appellants acted with intent.

Thus, the determination of pretext must be resolved by examining evidence in the record in addition to the amount of the time discrepancy. The evidence Progressive relies upon on this issue is presented in the declaration of HR Consultant James Kiedaisch. Although Kiedaisch described Progressive's conclusions about the investigation, he does not identify the evidence underlying those conclusions – i.e., how or why Progressive determined that appellants' falsification of their cards was intentional. Likewise Kiedaisch fails to explain why falsification by Lassen, Chavez, Marakian and Lipton was merely "sloppy record keeping." Progressive's response as disclosed in Kiedaisch's declaration is, therefore, conclusory and lacking in a foundation in the evidence in the record.

Nonetheless, elsewhere in the record, Kiedaisch's investigation notes and summary illuminate these issues. These documents disclose, however, similarities among the claims specialists who were fired and those who received warnings for the timecard errors. For example, Chavez admitted to investigators she had misreported her

23

time—she "[l]ooked at her timecard, says that lunch was probably a little longer than what she put down [on the card.]" Chavez's admission about misreporting her 30 minute lunch break was corroborated by April Brandenburg who went to lunch with Chavez, Lipton and Marakian on September 30, 2009. Brandenburg told investigators that they took "probably a 45 minute lunch." This evidence raises questions about Progressive's conclusion that Chavez's timecard error was unintentional or inadvertent. In fact, Chavez's response is substantially similar to Diaz's admission (recorded in the notes of her interview) that her timecard was incorrect.

In addition, Lassen told investigators that she kept track of her time by simply documenting her daily work schedule, rather than recording the actual time she worked. She figured "it all came out in the wash" as in "I buy dinner today and you buy dinner tomorrow." Avedian similarly told investigators that he worked the same schedule every day, and that he took lunch at the same time so that he did not write down his exact hours he worked every day. Evidence that Avedian and Lassen used a similar inexact method to record their time raises a question as to why they received different punishment for their inaccurate time cards.

Furthermore, it appears that while Progressive gave Lassen, Chavez and Lipton an opportunity to explain the discrepancies in their respective timecards, and that Progressive apparently gave credence to those explanations, Diaz, Avedian and Grialetto's explanations were summarily rejected or ignored by Progressive.[16] According to Diaz, she asked if she could get her calendar to refresh her recollection as to what happened on September 30, 2009, but she was not allowed to do so. The investigator's notes from Diaz's interview appear to corroborate Diaz's claim that she

_____

[16]    The trial court excluded as hearsay the testimony of Avedian, Diaz and Giarletto, concerning explanations and statements they made during the interviews. In our view, this evidence is non-hearsay and should have been admitted. This evidence was not being offered for the truth of the statements. Instead these statements are admissible to prove that Avedian, Diaz and Giarletto offered to explain their timecard discrepancies – a matter that is relevant to the issue of whether the appellants were similarly situated to the other claims specialists who were warned rather than terminated for the timecard errors.

24

told her interviewers she would have taken ETB (which appears to mean something akin to employee earned time on the books) or makeup time. Avedian testified that he told the investigators that he "forgot" to record the long lunch hour and indicated that he could take ETB hours. Giarletto testified that she repeatedly told investigators she would never have intentionally misreported her time because she was sure she would have made it up other days without being paid overtime as she often did, but it seemed to her that nothing she said mattered.

Finally, the investigatory notes and summary reflect it was reported that on September 29, 2009, Diaz had "jokingly said" to another colleague that she and Avedian "had been planning for 3 weeks about what they were going to do for lunch while the leadership group was gone" on September 30, 2009. The investigation summary characterized Diaz's comment as: "[a]t the time, an innocent, funny comment perhaps, but in retrospect, not so innocent." The fact that appellants had coordinated their September 30, 2009 lunch plans in advance does not, in our view, prove that they also intended to misrepresent the time they worked on September 30. In fact, Progressive's investigation summary indicates that there was some confusion among the claims specialists about how to properly document their time when they took extended breaks or lunches.

In short, we find evidence in the record sufficient to create a triable issue of material fact as to pretext; a reasonable juror could conclude the stated reason for the terminations was unworthy of credence given the inconsistencies in the evidence. (See *Hersant v. Department of Social Services* (1997) 57 Cal.App.4th 997, 1005.)

In view of the triable issues of fact, we conclude the trial court erred in granting summary judgment for Progressive on Avedian's and Diaz's respective wrongful termination claims.

## III. McGuinness's Appeal.

### A. The Trial Court Erred in Excluding McGuinness's Evidence.

McGuinness argues the trial court erred in excluding three portions of evidence on which she relied in opposing Progressive's motion for summary judgment or

25

adjudication. Progressive maintains the trial court properly sustained Progressive's hearsay objections to this evidence.

First, McGuinness cites to her own deposition testimony, stating that, shortly before she returned from leave, she had asked Jim Kiedaisch if she could work out of the Valencia office because it "would greatly reduce her stress." According to her testimony, she told Kiedaisch she had "[s]evere anxiety driving," sometimes she would forget where she was and would get lost easily, and she had been in two accidents; a transfer to the Valencia office would make her feel more at ease because she would not have to drive as far. The trial court sustained Progressive's hearsay objection to this evidence.

Second, McGuinness cites to her testimony that, on several occasions, upon her return to work, she told her new supervisor (Laura Doran) she was "still having a difficult time" and "was discussing it with [her] doctor at every appointment[; t]hey were still switching medications and [she] still felt overwhelmed[;] [she] still felt very scattered and unfocused." Again, the trial court sustained Progressive's hearsay objection to this testimony.

Third, McGuinness cites to her deposition testimony that, in response to the foregoing statements, Doran told McGuinness: "We're trying to be understanding, but at some point you're going to have to perform, and that's not going to be an excuse anymore." The trial court sustained Progressive's hearsay objection to this testimony as well.

The court erred. Because McGuinness relied on this evidence not to show that the words spoken were true but rather that the words were spoken in the course of her communications with Progressive—as part of the interactive process itself—in connection with the accommodation of her disability, the statements were nonhearsay. (*Weathers v. Kaiser Found. Hosps.* (1971) 5 Cal.3d 98, 109-110; *People v. Fields, supra,* 61 Cal.App.4th at pp. 1068-1069; *People v. Smith, supra,* 179 Cal.App.4th at p. 1003). As we will explain in addressing the merits of McGuinness's claims, she was prejudiced by the exclusion of this substantive evidence.

## II. Failure to Engage in the Interactive Process.

It is an unlawful employment practice (unless based upon a bona fide occupational qualification or applicable state or federal security regulation) "[f]or an employer . . . to fail to engage in a timely, good faith, interactive process with the employee . . . to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee . . . with a known physical or mental disability or known medical condition."[17] (Gov. Code, § 12940, subd. (n); *Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th 224, 243 (*Claudio*) [an employee may file a civil action based on an employer's failure to engage in the interactive process].)

""""The interactive process is . . . the primary vehicle for identifying and achieving effective adjustments which allow disabled employees to continue working without placing an "undue burden" on employers."" (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 261-262 (*Jensen*), citation omitted.) "Both employer and employee have the obligation 'to keep communications open' and neither has 'a right to obstruct the process.' (*Jensen, supra*, 85 Cal.App.4th at p. 266.) 'Each party must participate in good faith, undertake reasonable efforts to communicate its concerns, and make available to the other information which is available, or more accessible, to one party. Liability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith.' [Citation.]" (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1014 (*Scotch*).)

According to Progressive, "McGuinness bases her claim on Progressive's alleged failure to *continue* the interactive process once she returned to work. However, no such

---

[17] Progressive does not dispute that McGuinness has a disability within the meaning of FEHA (Gov. Code, § 12926, subd. (j)); the recently expanded definition of mental disability now includes bipolar disorder and similar conditions as examples of qualifying disabilities. (Cal. Code Regs., tit. 2, § 11065, subd. (d)(1) [formerly § 7293.6, subd. (d)(1), renumbered without substantive change].)

obligation existed. McGuinness concedes that she returned to work full-time without any restrictions on June 1, 2009. Upon her return to work, therefore, her request for accommodation had concluded and she had no basis for any new request." (Original italics.) Progressive mischaracterizes its obligation under the law.

In fact, contrary to Progressive's unsupported assertion, "Once the interactive process is initiated, the employer's obligation to engage in the process in good faith is continuous. '[T]he employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed." (*Scotch, supra,* 173 Cal.App.4th at p. 1013; *ibid.* ["This rule fosters the framework of cooperative problem-solving . . . by encouraging employers to seek to find accommodations that really work. . . ."].)

McGuinness presented evidence (although the trial court erroneously excluded it) that on several occasions after she returned to work, she told Doran she was "still having a difficult time" as she was discussing with her doctor at every appointment, he was "still switching [her] medications" and she "still felt overwhelmed," "very scattered and unfocused." In response, Doran told McGuinness: "We're trying to be understanding, but at some point you're going to have to perform, and that's not going to be an excuse anymore." In other words, McGuinness presented evidence upon which a reasonable trier of fact could conclude her "employer [wa]s aware that the initial accommodation [wa]s failing and further accommodation [wa]s needed" (*Scotch, supra,* 173 Cal.App.4th at p. 1013); yet, contrary to its continuing duty to engage in the interactive process in good faith, Progressive did nothing to explore what other accommodation(s) might be possible, and instead contributed to or caused a breakdown in the interactive process, as evidenced by Doran's characterization of a condition recognized as a disability under FEHA as "an excuse."[18] (*Id.* at p. 1014; and see *California Fair Employment & Housing*

---

[18]    Because it is undisputed that Progressive already had notice of McGuinness's disability, its reliance on *Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1249, and *Arteaga v. Brink's Inc.* (2008) 163 Cal.App.4th 327, 348, as authority for the

28

*Com. v. Gemini Aluminum Corp.* (2004) 122 Cal.App.4th 1004, 1015 ["A supervisor is the employer's agent for purposes of vicarious liability for unlawful discrimination"].) Because "[l]iability hinges on the objective circumstances surrounding the parties' breakdown in communication, and responsibility for the breakdown lies with the party who fails to participate in good faith" (*Scotch, supra,* 173 Cal.App.4th at p. 1014) and we find triable issues in this regard, summary adjudication of McGuinness's claim for failure to engage in the interactive process should not have been granted.[19] (See *Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1193 (*Wilson*) [whether the employer failed to engage in the interactive process is generally a question of fact].)

## III. Failure to Accommodate Disability.

It is unlawful and separately actionable under FEHA for an employer "to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee" unless the accommodation would cause "undue hardship" to the employer.[20] (Gov. Code, § 12940, subd. (m); see *Spitzer v. Good Guys, Inc.* (2000) 80

---

proposition McGuinness's statements to Doran were insufficient notice of a claimed disability or the request for accommodation of a claimed disability is entirely misplaced. Moreover, Progressive's own evidence documented McGuinness's inquiries regarding the possibility of initially returning to work part-time or working in the Valencia office in the short term.

[19] Progressive also argues McGuinness "never requested a *new* accommodation after returning to work," but cites no authority supporting such a requirement. (Original italics.) As the *Scotch* court explained, the law is to the contrary. (*Scotch, supra,* 173 Cal.App.4th at p. 1014 ["'[T]he employer's obligation to engage in the interactive process extends beyond the first attempt at accommodation and continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed"].)

[20] Generally, the employee bears the burden of giving the employer notice of the disability. "'This notice then triggers the employer's burden to take 'positive steps' to accommodate the employee's limitations. . . . [¶] . . . The employee, of course, retains a duty to cooperate with the employer's efforts by explaining [his or] her disability and qualifications. [Citation.] Reasonable accommodation thus envisions an exchange between employer and employee where each seeks and shares information to achieve the

29

Cal.App.4th 1376, 1383 (*Spitzer*).) The elements of a claim for failure to provide reasonable accommodation of a disability are (1) the plaintiff has a disability within the meaning of FEHA, (2) the plaintiff is qualified to perform the essential functions of the position and (3) the employer failed to reasonably accommodate the plaintiff's disability. (*Scotch, supra,* 173 Cal.App.4th at pp. 1009-1010, citing *Wilson*, *supra*, 169 Cal.App.4th at p. 1192.)

Progressive essentially argues it reasonably accommodated McGuinness until she returned to work without restrictions and that is all that is required. Again, the law is not so narrowly drawn. Assuming the employee is disabled, an employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith. (*Jensen*, *supra*, 85 Cal.App.4th at p. 263; *Claudio*, *supra*, 134 Cal.App.4th at p. 243 [same].)

"Where a necessary accommodation is obvious, where the employee requests a specific and available reasonable accommodation that the employer fails to provide, or where an employer participates in a good faith interactive process and identifies a reasonable accommodation but fails to provide it, a plaintiff may sue under section 12940(m)." (*Nadaf-Rahrov v. Neiman Marcus Group*, *supra*, 166 Cal.App.4th 952, 983.) Reasonable accommodation may include job restructuring, part-time or modified work schedule, reassignment to a vacant position and other similar accommodations for individuals with disabilities. (Gov. Code, § 12926, subd. (n).)

On this record, given Progressive's knowledge of McGuinness's disability and the surrounding circumstances, a reasonable trier of fact could conclude that Progressive

---

best match between the employer's capabilities and available positions.' [Citation.]" (*Prilliman v. United Air Lines, Inc*. (1997) 53 Cal.App.4th 935, 950.)

should have known McGuinness needed an accommodation in transitioning from months spent out of the office while seeking treatment for a recently diagnosed condition to a heavier workload than before her leave commenced; a reasonable trier of fact could also conclude McGuinness's requests to initially work part-time or in the Valencia office in the short term were reasonable accommodations Progressive failed to provide. Accordingly, summary adjudication of the claim for failure to make reasonable accommodation was improperly granted as McGuinness identified triable issues of material fact in this regard. (See *Spitzer*, *supra*, 80 Cal.App.4th at p. 1389 [because the extent of respondent's knowledge of the failure of job restructuring to reasonably accommodate appellant and the need to reassign her to another position is unclear, a triable issue is presented]; *Raine v. City of Burbank* (2006) 135 Cal.App.4th 1215, 1227, fn. 11 [whether the employer failed to provide the employee a reasonable accommodation for her disability is generally a question of fact]; *Wilson*, *supra*, 169 Cal.App.4th at p. 1193 [same].)

### *DISPOSITION*

The judgments in favor of Progressive on Avedian's and Diaz's complaints and orders granting summary adjudication of their respective causes of action for wrongful termination in violation of public policy are reversed. The judgment in favor of Progressive on McGuinness's complaint and order granting summary adjudication of her claims for failure to accommodate disability and for failure to engage in good faith in the interactive process are reversed. Avedian, Diaz and McGuinness are to recover their costs on appeal.


**WOODS, J.**

**We concur:**


**PERLUSS, P. J.**                                          **SEGAL, J.**[*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.